# STANDARD FASHION COMPANY *v.* MAGRANE-HOUSTON COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

No. 20. Argued January 25, 1921; restored to docket for reargument April 11, 1921; reargued January 16, 1922.—Decided April 10, 1922.

1. A contract for a term of two years from its date and from term to term thereafter until terminated by either party by giving three months' notice within thirty days after the expiration of any contract period, the contract to continue in effect during such three months, *held*, where notice was not given after the first two years, to have remained effective for two years longer and three months thereafter. P. 353.

2. A suit to restrain a violation of a contract does not become moot with the expiration of the contract if the bill also prays for damages capable of ascertainment. P. 353.

3. Under the General Laws of Massachusetts, c. 155, § 51, the existence of a corporation which has gone out of business and wound up its affairs is continued for three years thereafter for the purpose of prosecuting and defending suits. P. 353.

4. A contract between a manufacturer and a retailer creating an "agency" for the retailing of goods made by the former but to be purchased by the latter, with provisions for periodical exchange of old goods for new of less valuation, and for repurchase by the manufacturer of stock on hand at termination of the contract, *held* a contract of sale, within § 3 of the Clayton Act. P. 354.

5. In a contract between a manufacturer and a retailer granting the latter the "agency" for the sale at its store of goods bought by it from the former and stipulating that the retailer shall not assign or transfer the agency or remove it from its original location without the manufacturer's consent, a covenant of the retailer not to sell on its premises goods of the manufacturer's competitors during the term of the contract, *held*, a general restriction not confined to the particular shop. P. 354.

6. The Clayton Act was intended to supplement the Sherman and other antitrust acts, by reaching agreements in their incipiency. P. 355.

7. The purpose of § 3 of the Clayton Act in forbidding contracts of sale, made upon the agreement or understanding that the purchaser shall not deal in goods of the seller's competitors, which " may substantially lessen competition or tend to create a monopoly ", was not to prohibit the mere possibility of those consequences, but to prevent agreements which, in the circumstances, will probably lessen competition or create an actual tendency to monopoly. P. 356.

8. When the meaning of an act of Congress is plain on its face, there is no occasion to resort to the reports of congressional committees concerning it. P. 356.

259 Fed. 793, affirmed.

CERTIORARI to a decree of the Circuit Court of Appeals which affirmed a decree of the District Court dismissing a suit brought by the petitioner to restrain the respondent from violating a contract and for damages.

*Mr. Herbert Noble,* with whom *Mr. Charles E. Hughes, Mr. Robert G. Dodge,* and *Mr. James B. Sheehan* were on the briefs, for petitioner.[1]

The court below decided practically on the ground that within the four corners of the contract and without reference to the evidence, there had been provided means for lessening competition, irrespective of the use made of those means. It did not consider the undisputed evidence that there had been no lessening of competition and no tendency to create a monopoly, but that, on the contrary, the system was keenly competitive, extremely advantageous to the public and in the opinion of a competent witness economical.

There was no testimony showing that any deception, misrepresentation or oppression had been practised; no

---

[1] At the first hearing the case was argued by *Mr. Charles E. Hughes* on behalf of the petitioner. There was no appearance for the respondent. On April 11, 1921, the court ordered the case restored to the docket for reargument and directed the clerk to notify the Attorney General of its pendency.

complaint of any competitor or other person of any un-. fairness; nor any suggestion that the public had suffered· injury or that competitors had reasonable ground for complaint.

The words " may be " in § 3 of the Clayton Act are not a license to the imagination. Congress meant to deal with the discernment and suppression of practices in the course of commerce which, in connection with an accomplished sale or lease, were bringing about conditions adverse to its policy to prevent restraints of trade and establishment of monopolies, whether accomplished or in their earlier stages.

The court must consider all the facts peculiar to the business to which the restraint is applied, its condition before and after the restraint was imposed, the nature of the restraint and its effect actual or probable, the history of the restraint, the evil believed to exist, the reason for the adoption of a particular remedy, and the purpose or end sought to be obtained, because they are all relevant facts. Where a record discloses the facts, a conclusion of the actual effect or tendency can be found, and, from that, probabilities considered. *Chicago Board of Trade* v. *United States,* 246 U. S. 231. Section 3 of the act would naturally be interpreted as contended for by the District Court if the proviso at the end were omitted; but by the introduction of that proviso Congress meant to deal with facts as they are and to afford an opportunity to ascertain the conditions before and after the restraint complained of. *United States* v. *United States Steel Corporation,* 251 U. S. 417, 444.

The Clayton Act is not intended to change the law in any way with respect to the right of a manufacturer so to market his goods as will prevent the buyer from using them in competition with the business retained by the seller, of selling direct to the public, where it appears, as the uncontradicted evidence here shows, that without such

restriction the business of the seller would suffer injury. *United States* v. *Addyston Pipe Co.,* 85 Fed. 271; *Hartman* v. *Park & Sons Co.,* 153 Fed. 24, 42, appeal dismissed 212 U. S. 588.

The contract is a method for the plaintiff to market its own goods, the principal part of which it markets through contracts similar to the one here, and the balance of which it markets through its own salesrooms and through the mail. The scheme of the contract requires the agent, in conserving at all times the best interests of the agency, to protect the plaintiff's goods, sell them only at retail, and to return in bulk all that are not so sold, so that out-of-date patterns may not get on the market, and the plaintiff's own retained business as well as its reputation may not be injured. The object of establishing the agency is to sell patterns through the local dealer to the public, and not to the local dealer. The facts that defendant was required at all times to keep a minimum amount of stock, and at the end of the contract to return this minimum amount, and that by reason of the exchange privilege it could not be determined until the end of the contract and the return of the unsold patterns what the plaintiff would receive for its patterns or what the defendant would pay, show that it could not have been intended to sell the patterns to defendant. An unqualified title never vested in the defendant. It was intended to secure the exclusive services of defendant in selling plaintiff's patterns; and to allow the sale of other makes on the same premises would interfere with defendant's giving such exclusive service; and it was not intended to injure competitors or the public, and, as a fact, it did not, as appears from the record.

The negative covenant is not such a condition as is prohibited by § 3; because it is specifically limited to the premises described in the contract on which defendant was to sell plaintiff's patterns, leaving defendant free to

sell other makes in any other store it had or might have in the same or any other city; and because the actual facts show that it did not interfere with competition.

Before the passage of the Clayton Act, contracts of this character were frequently assailed as being in restraint of trade, either at common law or under the Sherman Act or state anti-monopoly statutes, and the view taken by the courts with practical unanimity was that they did not restrain trade. *Wilder Mfg. Co.* v. *Corn Products Refg. Co.,* 236 U. S. 165; *Cole Motor Car Co.* v. *Hurst,* 228 Fed. 280, 284; *Tillar* v. *Cole Motor Car Co.,* 246 Fed. 831, 832; *Whitwell* v. *Continental Tobacco Co.,* 125 Fed. 454; *In re Green,* 52 Fed. 104.

The validity, at least prior to the Clayton Act, of such pattern agency contracts cannot be questioned. State courts of the highest repute have not hesitated to sanction the issue of injunctions restraining the local agent or dealer from selling the patterns of other manufacturers than the one to whom he was bound by contract. *Butterick Publishing Co.* v. *Fisher,* 203 Mass. 122; *Standard Fashion Co.* v. *Siegel Cooper Co.,* 30 App. Div. 564; 157 N. Y. 60; 44 App. Div. 121; *Butterick Publishing Co.* v. *Rose,* 141 Wisc. 533; *Peerless Pattern Co.* v. *Gauntlett Dry Goods Co.,* 171 Mich. 158; Davies' Trust Laws and Unfair Competition, pp. 410 *et seq.;* see *Brown* v. *Rounsavell,* 78 Ill. 589; *Southern Fire Brick & Clay Co.* v. *Garden City Sand Co.,* 223 Ill. 616; *Ferris* v. *American Brewing Co.,* 155 Ind. 539; *J. W. Ripy & Co.* v. *Art Wall Paper Mills,* 41 Okla. 20; *Walsh* v. *Dwight,* 40 App. Div. 513, 517; *Weiboldt* v. *Standard Fashion Co.,* 80 Ill. App. 67; *Sullivan* v. *Rime,* 35 S. Dak. 75; *Wood Co.* v. *Greenwood Hardware Co.,* 75 S. Car. 378; *Staroske* v. *Pulitzer Publishing Co.,* 235 Mo. 67; *Rawleigh Co.* v. *Osborne,* 177 Ia. 208; *Rose* v. *Gordon,* 158 Wisc. 414.

Decisions heretofore made under § 3 of the Clayton Act sustain the petitioner's position. *Sperry & Hutchinson*

*Co.* v. *Fenster,* 219 Fed. 755; *Elliott Machine Co.* v. *Center,* 227 Fed. 124; *United States* v. *United Shoe Machinery Co.,* 227 Fed. 507; 234 Fed. 127; *Coca-Cola Co.* v. *Butler & Sons,* 229 Fed. 224; *Motion Picture Patents Co.* v. *Universal Film Co.,* 235 Fed. 398; *Pictorial Review Co.* v. *Curtis Publishing Co.,* 255 Fed. 206; *Curtis Publishing Co.* v. *Federal Trade Commission,* 270 Fed. 881; *Texas Co.* v. *Federal Trade Commission,* 273 Fed. 478; *Standard Oil Co.* v. *Federal Trade Commission,* 273 Fed. 478; *Canfield Oil Co.* v. *Federal Trade Commission,* 274 Fed. 571.

*Mr. Solicitor General Beck,* with whom *Mr. La Rue Brown* and *Mr. Elias Field,* Special Assistants to the Attorney General, were on the brief, (by special leave) for the United States, as *amicus curiae.*

MR. JUSTICE DAY delivered the opinion of the court.

Petitioner brought suit in the United States District Court for the District of Massachusetts to restrain the respondent from violating a certain contract concerning the sale of patterns for garments worn by women and children, called Standard Patterns. The bill was dismissed by the District Court and its decree was affirmed by the Circuit Court of Appeals. 259 Fed. 793.

Petitioner is a New York corporation engaged in the manufacture and distribution of patterns. Respondent conducted a retail dry goods business at the corner of Washington Street and Temple Place in the City of Boston. On November 25, 1914, the parties entered into a contract by which the petitioner granted to the respondent an agency for the sale of Standard Patterns at respondent's store, for a term of two years from the date of the contract, and from term to term thereafter until the agreement should be terminated as thereinafter provided. Petitioner agreed to sell to respondent Standard Patterns

at a discount of 50% from retail prices, with advertising matter and publications upon terms stated; and to allow respondent to return discarded patterns semiannually between January 15th and February 15th, and July 15th and August 15th, in exchange at nine-tenths cost for other patterns to be shipped from time to time thereafter. The contract provided that patterns returned for exchange must have been purchased from the petitioner and must be delivered in good order to the general office of the seller in New York. Respondent agreed to purchase a substantial number of standard fashion sheets, to purchase and keep on hand at all times, except during the period of exchange, $1,000 value in Standard Patterns at net invoice prices, and to pay petitioner for the pattern stock to be selected by it on terms of payment which are stated. Respondent agreed not to assign or transfer the agency, or to remove it from its original location without the written consent of the petitioner, and not to sell or permit to be sold on its premises during the term of the contract any other make of patterns, and not to sell Standard Patterns except at label prices. Respondent agreed to permit petitioner to take account of pattern stock whenever it desired, to pay proper attention to the sale of Standard Patterns, to conserve the best interests of the agency at all times, and to reorder promptly as patterns were sold. Either party desiring to terminate the agreement was required to give the other party three months' notice in writing, within thirty days after the expiration of any contract period, the agency to continue during such three months. Upon expiration of such notice respondent agreed to promptly return to petitioner all Standard Patterns, and petitioner agreed to credit respondent for the same on receipt in good order at three-fourths cost. Neglect to return the pattern stock within two weeks after the expiration of the three months' notice to relieve the petitioner from all obligation to

redeem the same. It was further stipulated that in the event the business property of the respondent, or a substantial part thereof, should be disposed of by respondent for business other than that of dry goods or as a general department store, the respondent should have the privilege of terminating the contract by giving the petitioner due notice of such change. Two weeks after the change in the premises had been made the respondent might deliver its stock of Standard Patterns to the petitioner for repurchase under the repurchase clause of the contract.

We agree with the courts below that, the notices not having been given as required by the contract, the same continued in force until three months from November 25, 1918, to wit, to February 25, 1919. It is contended in the brief for the Government, filed by it as *amicus curiae,* that as the date last mentioned had elapsed pending the suit, the case has become moot, but we are unable to agree with such contention. The bill prayed an assessment of damages as far as capable of ascertainment. The record shows that such damages were capable at least of partial ascertainment.

The suggestion that the respondent had wound up its affairs, and had gone out of business on March 27, 1920, is met by the General Laws of Massachusetts, c. 155, § 51, continuing its corporate existence for the period of three years for the purpose of prosecuting or defending suits by or against it.

The principal question in the case and the one upon which the writ of certiorari was granted involves the construction of § 3 of the Clayton Act, 38 Stat. 731. That section, so far as pertinent here, provides:

" It shall be unlawful . . . to lease or make a sale or contract for sale of goods, . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the

lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The contract contains an agreement that the respondent shall not sell or permit to be sold on its premises during the term of the contract any other make of patterns. It is shown that on or about July 1, 1917, the respondent discontinued the sale of the petitioner's patterns and placed on sale in its store patterns of a rival company known as the McCall Company.

It is insisted by the petitioner that the contract is not one of sale, but is one of agency or joint venture, but an analysis of the contract shows that a sale was in fact intended and made. It is provided that patterns returned for exchange must have been purchased from the petitioner. Respondent agreed to purchase a certain number of patterns. Upon expiration of the notice of termination the respondent agreed to promptly return all Standard Patterns bought under the contract. In the event of the disposition of the business property of the respondent at Washington Street and Temple Place, the respondent might deliver its stock of Standard Patterns to the petitioner for repurchase under the repurchase clause of the contract.

Full title and dominion passed to the buyer. While this contract is denominated one of agency, it is perfectly apparent that it is one of sale. *Straus* v. *Victor Talking Machine Co.*, 243 U. S. 490.

The contract required the purchaser not to deal in goods of competitors of the seller. It is idle to say that the covenant was limited to the premises of the purchaser, and that sales might be made by it elsewhere. The contract should have a reasonable construction. The pur-

chaser kept a retail store in Boston.   It was not contemplated that it would make sales elsewhere.   The covenant, read in the light of the circumstances in which it was made, is one by which the purchaser agreed not to sell any other make of patterns while the contract was in force. The real question is:   Does the contract of sale come within the third section of the Clayton Act because the covenant not to sell the patterns of others "may be to substantially lessen competition or tend to create a monopoly."

The Clayton Act, as its title and the history of its enactment disclose, was intended to supplement the purpose and effect of other anti-trust legislation, principally the Sherman Act of 1890.   The latter act had been interpreted by this court to apply to contracts, combinations and conspiracies which unduly obstruct the free and natural flow of commerce.   The construction since regarded as controlling was stated in *Standard Oil Co.* v. *United States,* 221 U. S. 1, 58, wherein this court construed the act as intended to reach combinations unduly restrictive of the flow of commerce or unduly restrictive of competition.   It was said that the act embraced:

" All contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy."   See also *United States* v. *American To-*

9544°—23——26

*bacco Co.*, 221 U. S. 106; *United States* v. *Terminal Railroad Association*, 224 U. S. 383; *Standard Sanitary Manufacturing Co.* v. *United States*, 226 U. S. 20; *United States* v. *Union Pacific R. R. Co.*, 226 U. S. 61; *United States* v. *Reading Co.*, 226 U. S. 324; *Nash* v. *United States*, 229 U. S. 373; *Straus* v. *American Publishers' Association*, 231 U. S. 222.

As the Sherman Act was usually administered, when a case was made out, it resulted in a decree dissolving the combination, sometimes with unsatisfactory results so far as the purpose to maintain free competition was concerned.

The Clayton Act sought to reach the agreements embraced within its sphere in their incipiency, and in the section under consideration to determine their legality by specific tests of its own which declared illegal contracts of sale made upon the agreement or understanding that the purchaser shall not deal in the goods of a competitor or competitors of the seller, which may " substantially lessen competition or tend to create a monopoly."

Much is said in the briefs concerning the Reports of Committees concerned with the enactment of this legislation, but the words of the act are plain and their meaning is apparent without the necessity of resorting to the extraneous statements and often unsatisfactory aid of such reports. See *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co.*, 257 U. S. 563, and previous decisions of this court therein cited.

Section 3 condemns sales or agreements where the effect of such sale or contract of sale " may " be to substantially lessen competition or tend to create monopoly. It thus deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only. But we do not think that the purpose in using the word " may " was to prohibit the mere possibility of the consequences described.

It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly. That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial.

Both courts below found that the contract interpreted in the light of the circumstances surrounding the making of it was within the provisions of the Clayton Act as one which substantially lessened competition and tended to create monopoly. These courts put special stress upon the fact found that, of 52,000 so-called pattern agencies in the entire country, the petitioner, or a holding company controlling it and two other pattern companies, approximately controlled two-fifths of such agencies. As the Circuit Court of Appeals summarizing the matter pertinently observed:

" The restriction of each merchant to one pattern manufacturer must in hundreds, perhaps in thousands, of small communities amount to giving such single pattern manufacturer a monopoly of the business in such community. Even in the larger cities, to limit to a single pattern maker the pattern business of dealers most resorted to by customers whose purchases tend to give fashions their vogue, may tend to facilitate further combinations; so that the plaintiff, or some other aggressive concern, instead of controlling two-fifths, will shortly have almost, if not quite, all the pattern business."

We agree with these conclusions, and have no doubt that the contract, properly interpreted, with its restrictive covenant, brings it fairly within the section of the Clayton Act under consideration.

*Affirmed.*