## SWIFT & CO. v. FEDERAL TRADE COMMISSION.*

(Circuit Court of Appeals, Seventh Circuit. February 16, 1925. Rehearing Denied October 13, 1925.)

### No. 3215.

1. **Evidence 11—Courts will take judicial notice of agitation and discussion preceding enactment of Sherman Law and Clayton Act.**

Agitation and discussion preceding enactment of Sherman Law (Comp. St. §§ 8820–8823, 8827–8830) and supplementary Clayton Act are matters of history, of which courts will take judicial notice in construing such acts.

2. **Constitutional law 70(3)—Courts, in construing legislation, are not called upon to pass judgment on its wisdom.**

Courts, in construing legislation, are not called upon to pass judgment upon its wisdom.

*Certiorari granted 46 S. Ct. 107, 70 L. Ed. —.

3. **Statutes 181(1)—Canons of statutory construction call for expression of legislative intention, and effectuate thought conveyed by plain and unambiguous language.**

Canons of statutory construction call for an expression of legislative intention, and at same time effectuate thought conveyed by plain and unambiguous language.

4. **Constitutional law 210—Monopolies 20—Distinction between corporations and individuals made by Clayton Act not arbitrary classification.**

Distinction between corporations and individuals made by Clayton Act, § 7 (Comp. St. § 8835g), prohibiting corporation engaged in commerce from acquiring stock of another corporation, also engaged in commerce, where effect of acquisition is to lessen competition, is not arbitrary classification.

5. **Constitutional law 296(1)—Monopolies 20—Provision of Clayton Act against acquisition of stock of competing corporation construed; act held not violative of due process clause.**

Clayton Act, § 7 (Comp. St. § 8835g), prohibiting corporation from acquiring stock in another corporation, where effect of such acquisition may be to substantially lessen competition, is applicable, irrespective of whether competition prior to consolidation was substantial, and whether effect of acquisition was injurious to public, nor is it, when so construed, violative of due process clause.

Petition by Swift & Co., to set aside an order of the Federal Trade Commission. Petition denied.

James M. Sheean, of Chicago, Ill., for petitioner.

Adrien F. Busick and Everett F. Haycraft, both of Washington, D. C., for respondent.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Petitioner seeks to set aside an order of the Federal Trade Commission directing it to:

"(1) Cease and desist from further violating section 7 of the Clayton Act by continuing to own or hold, either directly or indirectly, by itself or by any one for its use and benefit, any of the capital stock of the Moultrie Packing Company and of the Andalusia Packing Company, or either of them, and cease and desist from holding, controlling and/or operating, or causing to be held, controlled and/or operated by others for its use and benefit, the former property and business either of the said Moultrie Packing Company or of the said Andalusia Packing Company, which have been held, controlled, and operated by respondent and its employees and agents, following and as a result of

respondent's unlawful acquisition of the capital stocks of said named corporations; and to that end, respondent shall:

"(2) So divest itself of all the capital stock heretofore acquired by respondent, including all the fruits of such acquisitions, in whatever form they now are, whether held by respondent or by any one for its use and benefit, of the Moultrie Packing Company, a corporation, and of the Andalusia Packing Company, a corporation, or either of them, in such manner that there shall not remain to respondent, either directly or indirectly, any of the fruits of said acquisitions, including the control and/or operations of said corporations, or either of them, resulting from such acquisitions and/or holdings of such capital stocks.

"(3) In so divesting itself of such capital stocks, respondent shall not sell or transfer, either directly or indirectly, any of such capital stocks to any officer, director, stockholder, employee, or agent of respondent, or to any person under the control of respondent, or to any partnership or corporation either directly or indirectly owned or controlled by respondent. * * *"

A record of inexcusable length discloses facts almost free from controversy.

Petitioner, in June, 1917, acquired all of the stock of the Moultrie Packing Company, of Moultrie, Ga., and in July, 1917, all of the capital stock of the Andalusia Packing Company, of Andalusia, Ala. It immediately went into possession of both plants and managed and operated them.

The Moultrie Packing Company was organized in 1913 by local business men of Moultrie, Ga., and its growth was rapid, its business prosperous, and its profits large and increasing.

The Andalusia Company of Andalusia, Ala., was similarly organized in October, 1915, with a somewhat larger capitalization, and its brief history was one of growth and profit. Both packing companies slaughtered cattle and hogs. Their history is briefly written by the following table:

| Moultrie Packing Company. | 1914. | 1915. | 1916. | 1917. (Five Months.) |
|---|---|---|---|---|
| Pork ....... lbs. | 200,598 | 2,199,441 | 7,305,506 | 3,907,909 |
| Beef ....... lbs. | 24,739 | 442,221 | 196,333 | 252,280 |
| Lard ....... lbs. | 20,320 | 326,580 | 1,171,875 | 827,575 |

In the five months of 1917, its profits exceeded 60 per cent. of its paid-up capital.

| Andalusia Packing Company. | 1916. (Part of Year.) | 1917. (Five Months.) |
|---|---|---|
| Pork ....... lbs. | 3,065,341 | 2,914,692 |
| Beef ....... lbs. | 6,426 | 189,523 |
| Lard ....... lbs. | 383,774 | 564,293 |

For the year ending May 1, 1917, its profits were $62,646.80, or about 50 per cent. of its paid-up capital.

Petitioner was in direct competition with these two packing companies, although the hogs slaughtered by the Moultrie and Andalusia companies were not corn fattened, and the pork was known as "soft." The two packing companies, however, furnished all of the competition which petitioner and the four other large Chicago packing houses met in southeastern United States. Though the total number of hogs and cattle slaughtered at these two packing houses was but a small fraction of 1 per cent. of that killed in the United States, the competition in fresh pork sales which they furnished in this territory was substantial and direct.

Section 7 of the so-called Clayton Act (Comp. St. § 8835g) provides:

"Sec. 7. That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce.

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce.

"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition."

The Commission found, and no other finding could have been made, that the purchaser was engaged in interstate commerce; that, while so engaged, it purchased all the stock of the Moultrie Packing Company and the stock of the Andalusia Packing Company, both of which companies were also engaged in interstate commerce; and that the effect of such acquisition was to substantially lessen competition between the corporation whose stock was acquired, and the corporation making the acquisition.

These findings would necessarily dispose of the application were it not for petitioner's insistent urge that the statute does not mean what it says, and that the court should read into it "the rule of reason" and insert additional requirements, viz.: That the competition between the two companies prior to consolidation was substantial, and the effect of the acquisition was injurious to the public.

It further contends that said section 7 is unconstitutional unless these essential facts are read into it.

[1] The general object and purpose of this statute is so evident that it is hardly necessary to state it. It and the parent legislation, the Sherman law (Comp. St. §§ 8820–8823, 8827–8830), sought to maintain a wholesome competition between those engaged in competitive interstate commerce. The agitation and discussion preceding their enactment are matters of history of which we must take judicial notice. In its title to this legislation, the Congress stated its purpose, thus: "An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes."

It particularly referred to a previous act "to protect trade and commerce against unlawful restraints and monopolies."

The report of the Senate Judiciary Committee confirms this conclusion.

"Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the Act of July 2, 1890, or other existing anti-trust acts, and thus by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation."

The Clayton Act "was intended to supplement the Sherman Act, and within its limited sphere established its own rule." United Shoe Mach. Co. v. United States, 258 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708.

As was stated in Standard Co. v. Magrane-Houston Co., 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653:

"The Clayton Act sought to reach the agreements embraced within its sphere in their incipiency, and in the section under consideration to determine their legality by specific tests of its own.  *  *  * "

The statute does not prohibit all acquisitive contracts. It is only when such acquisition produces "the effect" described that the statute condemns. It is worthy of note that such effect may be either to (a) substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition; (b) restrain such commerce in any section or community; or (c) tend to create a monopoly of any line of commerce. (a) cannot be construed without considering (b) and (c). If the court were to read into (a) the elements which petitioner has asked us to insert, what would become of the requirements of (b) and (c)?

[2] Nor are we, in construing this legislation, called upon to pass judgment respecting its wisdom. Conceding that the Congress was authorized under the commerce clause and other sections of, or amendments to, the Constitution, to deal with the subject-matter, it alone could determine the wisdom of such legislation and make such exceptions or reservations as it deemed the needs of commerce and the welfare of the public required.

We are therefore confronted with a simple legal question, one of statutory construction. We must divorce it from the associated economic questions.

[3] The canons of statutory construction call for an expression of legislative intention, and at the same time effectuate the thought conveyed by plain and unambiguous language.

In the present case there is fortunately not the slightest conflict between the obvious intention of Congress and the language chosen to convey the thought. Under such circumstances, to search for avenues of escape, to conjure up hardships that might possibly result from the enforcement of such legislation, or even to anticipate and avoid constitutional objections, is not a proper judicial function.

It is also urged by petitioner that, had it first purchased the assets of these two packing companies rather than the stock, the transaction would have avoided the condemnation of the statute. With this assumption

as the major premise of its syllogism, it contends that the transaction was, in fact, the acquisition of the assets of the Moultrie and Andalusia companies.

We are not prepared to, nor called upon to express an opinion respecting the legality of a purchaser's acquisition of the assets of competitors engaged in commerce. The facts in this case do not make it necessary for us to even discuss the question. Petitioner bought the stock. After it acquired the stock, it made its servants and employees officers and directors of these companies. It took over the active management, and conducted the business so that existing competition was eliminated.

If petitioner's major premise be accepted, then the distinction between acquiring the stock and purchasing the assets cannot be ignored, when the evidence is examined to ascertain whether petitioner purchased stock or assets.

[4] Constitutionality. It is first urged that the distinction made between corporations and individuals is arbitrary.

But was there not a basis for the classification? Congress was dealing with business consolidations of large size. It was endeavoring to prevent the creation of trusts and monopolies. Corporations are the instrumentalities commonly used by those engaged in large enterprises. They lend themselves handily to activities of large proportions. Their control can be readily acquired; hence the classification has some basis for its existence.

Does the legislation violate any of petitioner's right of "life, liberty, or property without due process of law"? This is, in view of our construction of the statute, the real question in the case.

Recognizing, as we do, that the prohibition relates only to those contracts, the effects of which is to lessen competition between competing corporations engaged in commerce, we are confronted with the narrow question of petitioner's right (as against the public) to make contracts for the acquisition of a competitor's capital stock, the necessary effect of which is to lessen, or to eliminate entirely, competition from this source.

Courts are constantly called upon to consider deprivation of "liberty" or "property," in the light of changing economic conditions, due to the increase and congestion of population, as well as to changes in methods of business. "Due process," "liberty of contract," and "property rights" are somewhat relative terms, incapable of accurate, precise, and lasting definition. In fact, changes in our living, in methods of business, and in the ever-increasing functions of government, must be recognized in construing decisions rendered at widely varying periods of our national history. Legislation which, under certain conditions, may be found to be an arbitrary and capricious interference with the individual's right to "right, liberty, or property," at a later period in the light of experience and changed conditions may be upheld.

If, as petitioner's counsel concedes, the section is free from "constitutional objection," if "the powers and activities of its ministerial agency" (the Federal Trade Commission) are properly "circumscribed," the query arises, To what circle should such powers be confined?

[5] We are still dealing with words of general meaning, and make no progress. Must Congress act only when the child has grown to the stature of a giant? If authority exists to curb, or to dissolve, a corporation when it has reached the trust stage, may Congress not take steps to arrest the corporation's growth before the final stage has been reached? Is our national defense policy based upon an impending conflict, or a desire to prevent one? In order to build the Panama Canal, the mosquito was eliminated before the yellow fever appeared. The government may, under the commerce clause of the Constitution, forbid every contract "which is reasonably calculated to injuriously affect the public interest." Atlantic Coast Line v. Riverside Mills, 219 U. S. 202, 31 S. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7. It may act to anticipate or prevent an unfortunate situation, as well as deal with one that existed.

As before stated, the Clayton Act (38 Stat. 730), supplemented the Sherman law, the practical enforcement of which was found difficult, and often resulted in hardships to innocent parties. The section under consideration sought by means which the Congress deemed expedient and effective, to prevent a condition which the Sherman law was designed to overcome when once it existed. Certainly courts should hesitate to say that the means selected are not "appropriate" or "primarily adapted" to accomplish the desired end, when it is conceded that the prevention of such "ends" through dissolution is within the recognized powers of Congress.

In other words, the issue is not one of authority of Congress to deal with an unde-

sirable condition, but rather an asserted want of power to prevent that result through the means resorted to for that purpose. And the answer seems to be that Congress, having the authority to regulate interstate commerce, may do so by such means as to it seems appropriate, to prevent a condition which is contrary to the settled public policy of the government and inimical to the welfare of its people.

If competing corporations may not consolidate, it naturally follows that it will be difficult for one corporation ever to monopolize an industry. So it may be said that the "means" are "appropriate," and "primarily adapted" to accomplish the end. Whether such "means" may not, when strictly enforced, lead to "evils" greater than the "cure," is another question, one which the Congress only may determine.

It was also urged that paragraph 3 modified the first paragraph of section 7, and, thus amended, aids the petitioner. It may well be that the third paragraph of section 7 modifies the first and limits it, but we find in the evidence nothing to support a finding that petitioner acquired the stock of its competitors "solely for investment and not using the same by voting or otherwise to bring about, or attempting to bring about the substantial lessening of competition."

It would be difficult to conceive of any case where one corporation purchased all of the stock of its competitor solely for investment. Such a case would be a rare one. Certainly petitioner herein did not purchase this stock solely for investment.

In conclusion, it might be suggested to respondent that delay in instituting proceedings of the character here under review, frequently works an unnecessary hardship to the aggrieved party. Certainly a limitation of time should be fixed, by statutory enactment or otherwise, during which these proceedings must be instituted. The purchasing company would not then (as appears was done in the case before us) invest vast sums of money enlarging and improving the acquired property before respondent took steps to restore the status of the companies.

The petition is denied.

ALSCHULER, Circuit Judge. The apparent considerable benefit to the localities from the increased manufacturing activities there, which followed the transactions complained of, illustrates the possible hardship and resultant embarrassment in strictly applying the statute in accordance with its plain and comprehensive terms. But the very defense here made would tend to show the same local benefit would have accrued had the stock purchases in question not occurred. In large measure the acquirement of the stock is sought to be justified by contention and proof that petitioner would in any event have established plants of its own there or thereabout. Had this been done, the localities would have had, not only new plants of this large and well-established concern, but the existing plants as well. But it is strongly urged that the ones already there would not likely have withstood the added competition, and that in any event they would not long have survived. Be this as it may, this cannot suspend or avoid the very broad and sweeping statute which denounces acquisition by one corporation of the stock of another, or of the stock of two or more other corporations, where this may substantially lessen competition between them, or restrain commerce in any section or community, or tend to create monopoly in any line of commerce. If an exception to the operation of the statute ought and is to be raised in cases where the concern whose stock is acquired is comparatively small or weak, or for any reason unlikely long to endure, it must come through statutory enactment, and not by judicial construction.