96 N.J. Super. 50 (1967)
232 A.2d 447
LAWRENCE BEEMER AND ROSE BEEMER, PLAINTIFFS-RESPONDENTS,
v.
SOLAR OIL COMPANY SUSSEX, A PARTNERSHIP AMONG SATTENIG KURKJIAN [LEE] AND EDWARD G. WEISS, TRUSTEE FOR MYRON H. KURKJIAN, JR., AND MYRON H. KURKJIAN, JR., PARTNERS, SOLAR OIL SUSSEX, INC., A CORPORATION, MYRON J. KURKJIAN, JR., INDIVIDUALLY AND AS PRESIDENT AND MANAGING DIRECTOR OF SOLAR OIL SUSSEX, INC., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 20, 1967.
Decided July 12, 1967.
*51 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. Francis E. Bright argued the cause for appellants (Messrs. Dolan & Dolan, attorneys).
Mr. Frank G. Schlosser argued the cause for respondents (Messrs. Van Blarcom, Silverman & Weber, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendants Myron H. Kurkjian, Jr. and Solar Oil Sussex, Inc. appeal from a Chancery Division judgment, entered on the pleadings, cancelling and discharging of record as illegal and void under the Unfair Motor Fuel Practices Act (L. 1953, c. 413; N.J.S.A. 56:6-19 et seq.) the lease, sublease and a related agreement covering the Beemer gasoline service station on Route 15, Sparta, Sussex County.
The issue is whether the trial judge properly decided, on the pleadings alone, that an exclusive requirements contract between a service station operator and his distributor violated the "little Clayton Act" provision of the Unfair Motor Fuels Practices Act, N.J.S.A. 56:6-22(b), where the complaint merely recited and interpreted the contract, the answer denied *52 plaintiffs' interpretation, and the court did not have the benefit of any allegations or proof as to the line of commerce, the relevant market, and whether the competition foreclosed constituted a substantial share of that market. Without such information there could not be a proper decision, and we therefore reverse and remand the matter for a full trial.

I
The facts, insofar as set out in the pleadings and attached exhibits, are not in dispute. Prior to 1957 a partnership known as Solar Oil Company Sussex operated a petroleum marketing and distribution business in the Sussex County, N.J. area. The partnership's operations included the sale of gasoline, oil and related products through service stations, most of which were owned and operated by individual dealers. The partnership consisted of Sattenig Kurkjian Lee and Edward G. Weiss, trustee for Myron H. Kurkjian, Jr. under a deed of trust executed by Myron's father in 1945. Plaintiff Lawrence Beemer was then employed as a service station attendant by one of the partnership's dealers on Route 15 in Sparta. He had expressed to the partnership his desire to own and operate a place of his own, and to that end discussed with its representative the selection of a proper site for the construction of a service station. Ultimately Beemer and his wife acquired a parcel on Route 15, raising part of the purchase price by a personal loan. They then borrowed $9,000 from the partnership to build the service station, giving back a mortgage on the premises to be paid at the rate of 1¢ for every gallon of gasoline sold, the minimum monthly payment being fixed at $100.
As part of the transaction the Beemers on August 9, 1955 leased the premises to the partnership for a term of 15 years at an annual rental of $600; the partnership, in turn, subleased to Beemer alone for a term of 14 years and 11 months at the same rental. The sublease provided that Beemer was not to assign the lease or sublet any portion *53 of the premises without the partnership's written consent. Beemer represented that there was no existing contract with any company other than the partnership for the sale or distribution of gasoline or other petroleum products from the premises. The sublease also provided that the premises were to be used as a gasoline and automobile service station, Beemer to have the privilege, at the partnership's sufferance, to do minor repair work as long as it did not interfere with the sale of petroleum products.
The lease was recorded but the sublease was not. Since the annual rental called for under these agreements was the same and the parties desired to avoid paying each other the rent due, they executed a further instrument on August 9, 1955 whereby they agreed that neither would be required to pay to the other the rents reserved. The partnership proceeded to furnish and install at its own expense gasoline pumps, underground fuel storage tanks and other equipment for the distribution of gasoline and related petroleum products. Some two years after the execution of the lease and sublease plaintiffs paid off the mortgage and secured from the partnership a subordination of its lease to the lien of a new mortgage whose proceeds were used to pay off the original mortgage.
Defendant Solar Oil Sussex, Inc. was formed in 1957 and succeeded to ownership of all of the assets of the partnership, Solar Oil Company Sussex. Beemer has operated the Sparta service station since 1955.
In the summer of 1965 one Morris Zell offered plaintiffs $67,000 for the service station property and business, but the recorded 15-year lease of August 9, 1955 allegedly prevented consummation of the sale. Plaintiffs accordingly had their attorneys write Myron J. Kurkjian, Jr., president of the Solar company, on November 23, 1965, stating that the "pretended lease" was standing in the way of the sale and demanding its immediate cancellation. Defendants' attorneys having advised that Solar was unwilling to accede to *54 the demand, plaintiffs instituted the present Chancery Division action.
The stress of the complaint was upon the fact that the sale of the service station property and business to Zell was being defeated by the lease plaintiffs had given the partnership. An attack was leveled against Edward G. Weiss, now deceased, who was a member of the partnership prior to the incorporation of Solar by reason of his being a trustee for Kurkjian, Jr. It was alleged that as attorney Weiss prepared the three instruments executed on August 9, 1955; that he had not fully explained their purport to plaintiffs nor told them he was a partner in Solar Oil Company Sussex; that the lease and sublease put plaintiffs in "long-term economic bondage" and were grossly unfair and, finally, that Weiss in fact represented conflicting interests at the time. The second line of attack adopted by plaintiffs in their complaint was that the Unfair Motor Fuels Practices Act of 1953 made the exclusive requirements contract between Beemer and the partnership unlawful and therefore void. Since Solar Oil Sussex, Inc. refused to cancel the 15-year lease, plaintiffs demanded judgment cancelling the August 9, 1955 leases and related agreement, directing their discharge of record as void and of no effect, and awarding compensatory damages of $67,000 by reason of the loss of the Zell sale, together with punitive damages and interest.
Solar's answer raised, among other affirmative defenses, laches, estoppel and good faith refusal to accede to plaintiffs' demand for cancellation. The company, as successor to the partnership, also counterclaimed, demanding judgment declaring the lease and sublease valid and decreeing their specific performance.
Plaintiffs answered the counterclaim and then moved for judgment on the pleadings, alleging that they raised no material issue of fact or legal defense, nor did the counterclaim set forth a legal claim upon which relief could be granted. In the alternative, plaintiffs moved for summary judgment upon their demand for cancellation.
*55 At the argument on the motion plaintiffs' counsel stated there was not "a single legitimate economic advantage" for Solar in the operation. Zell he said, could not close the service station deal because if he did so he would only be buying a lawsuit. Counsel admitted that Zell wanted to get rid of the Sunoco gasoline and petroleum products for which Solar was distributor and to substitute another line. He contended that the lease and sublease worked an economic hardship and violated the policy of the Unfair Motor Fuels Practices Act. An additional argument made (but not raised in the pleadings) was that the leasing arrangements constituted an unlawful restraint upon the alienation and use of property.
In the course of defense counsel's answering argument, the trial judge asked, "Don't you think though that this turns not upon the factual situation * * * it really turns upon the statute?" Counsel replied, "I think that's true * * *." When the judge later inquired of the attorneys whether they did not agree that the case turned upon a question of law, both conceded that it did.
In his letter opinion, the trial judge observed that there were some disputed fact issues, such as whether Weiss represented conflicting interests and whether the contracts were actually unfair to plaintiffs in view of the financial aid they had received from the partnership. However, he continued, "there can be no dispute on the facts in reaching the legal problem here involved," namely, whether the statute, N.J.S.A. 56:6-22(b), had been violated. Immediately after reciting the statutory text the trial judge, without more, declared:
"It is clear that the `effect' of the arrangement entered into by these parties `may be to substantially lessen competition.' Just because Plaintiff is tied up for 15 years he may not install tanks or pumps for the dispensing of gasoline upon the demised premises without consent of Solar. He must use the premises as a gasoline station. The purpose of Solar in obtaining the lease is crystal clear."
*56 Accordingly, he concluded that the arrangements between the parties were void, citing Gionti v. Crown Motor Freight Co., 128 N.J.L. 407, 411 (E. & A. 1942), and Lewis v. Collins, 1 N.J. Misc. 392 (Cir. Ct. 1923). Although of the view that the contracts offended the policy of freedom of alienation of property, the trial judge stated that no judgment could be based on this ground because each such case must be decided on its merits.
Defendants moved for a rehearing, alleging there had been no admission that the leases were made with intent to injure competitors or to destroy or substantially lessen competition, or that their effect might be to substantially lessen competition. Defense counsel had apparently had occasion to do further legal research following the argument his colleague had made on the original motion, for he now argued that assuming the leases prevented Beemer from selling any product other than that distributed by Solar, the question was whether, insofar as the gasoline business generally was concerned, the area involved was reasonable. When the trial judge pointed out that the parties had conceded that the only question involved was one of law, defense counsel frankly stated, "I think we misled the Court and that perhaps we were mistaken in conceding that question * * *." He explained that his colleague had believed the leases did not offend the law because they were within the exception of the statute dealing with the use of tanks and pumps (the last clause of the statute about to be quoted). The question remained as to whether the leases substantially lessened competition.
In responding to this argument plaintiffs' attorney oversimplified the matter when he insisted that geographic area was not the test; under the circumstances, he said, the arrangements between the parties could have only an adverse effect upon competition.
At the close of the rehearing the trial judge stated that although not greatly impressed by any argument based on the Zell offer, he was satisfied he had correctly decided *57 the matter in the first instance. He then entered the judgment here under appeal.

II
There can be no question that the arguments made at the initial hearing on plaintiffs' motion for judgment on the pleadings were simplistic in the extreme. Neither counsel as much as referred to the leading cases and authorities touching the central issue. True, no New Jersey case has considered the reach of N.J.S.A. 56:6-22(b), but there is no lack of authority, either decisional or critical, dealing with the question of whether an exclusive requirements arrangement, such as the one allegedly here involved, violated a provision like that found in our statute. N.J.S.A. 56:6-22(b) declares:
"It shall be unlawful and a violation of this act for any distributor, refiner, wholesaler or supplier, with intent to injure competitors or destroy or substantially lessen competition:

* * * * * * * *
(b) To lease or make a contract on condition, promise, agreement or understanding, where the effect of such lease, contract on condition, promise, agreement or understanding may be to substantially lessen competition that the lessee or purchaser thereof shall not use or deal in goods, wares, merchandise, supplies or other commodities of a competitor of such distributor, refiner, wholesaler or supplier except that this shall not apply to tanks or pumps if furnished by the distributor, refiner, wholesaler or supplier to be used in the distribution of its motor fuel;

* * * * * * * *"
(Although the sublease nowhere in terms restricts plaintiffs' source of nonpetroleum products (e.g., tires, batteries, accessories, antifreeze), but does prohibit them from installing additional gasoline tanks and pumps without Solar's written consent, thereby limiting them to using the petroleum products Solar handles, yet at the hearing on plaintiffs' motion the parties spoke of the leases as exclusion contracts in the broadest sense. We shall deal with them as such.)
*58 As noted, the trial judge, after quoting N.J.S.A. 56:6-22(b), proceeded directly to the conclusion that the effect of the leases was clearly such as "may be to substantially lessen competition." This was little more than a resort to the statutory language. The judge was undoubtedly misled by the broad and unfocused approach taken by counsel in their respective arguments, and their ready acquiescence in his suggestion that nothing more was involved than a simple question of law. Since the lease to the partnership removed one outlet (plaintiffs' station) from Solar's competitors for 15 years, the trial judge apparently assumed that it was therefore per se illegal. The fact remains that resolution of the issue presented required full and persuasive evidence relevant to the question of the effect of the lease on competition.
Before proceeding to a discussion of the basic issue, we dispose of the argument advanced by defense counsel below, and suggested here, that Solar was saved by the exception found in the final clause of the quoted statute. The answer to that contention must obviously be that it was not, for otherwise the exception would overrule the rest of the statute  an unreasonable result. This exception ties in with N.J.S.A. 56:6-2(g), which requires that retail dealers sell the motor fuel designated by the sign posted on the pump. The exception merely allows a distributor to compel dealers to use its brand of gasoline, stored in tanks and delivered from pumps which it installed and owns.

III
Since there are no reported cases under our statute, we must look to federal law. This is justifiable since, except for the intent element, N.J.S.A. 56:6-22(b) is substantially the same as section 3 of the Clayton Act, 38 Stat. 731 (1914), 15 U.S.C.A. § 14. Section 3 provides, in pertinent part:
"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for *59 sale of goods, wares, merchandise, machinery, supplies, or other commodities, * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."
In Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922), the first of the cases decided by the Supreme Court under section 3, the court said that the phrase "may be to substantially lessen competition" does not prohibit the mere possibility of that result but means that competition would "probably lessen" or that "an actual tendency to monopoly" exists. Emphasized was the fact that the act was not intended to reach every "remote lessening" of competition, but only those which were substantial. The court did not indicate just where "remote" ended and "substantial" began, but in the case of a distributor who controlled a large share of the market a prohibited agreement might be found as a matter of law. That case was followed one week later by United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922), where the court held that even though a contract does "not contain specific agreements not to use the [goods] of a competitor," if "the practical effect * * * is to prevent such use," it comes within the ban of section 3. As in Standard Fashion, the court further held that a finding of domination of the relevant market by the lessor or seller was sufficient to support the inference that competition had or would be substantially lessened by the contracts there involved.
Standard Oil Company of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), rehearing denied 338 U.S. 808, 69 S.Ct. 1051, 94 L.Ed. 489 (1950), involved exclusive requirements contracts with service station owners. The market was stipulated as seven contiguous western states, and the line of commerce as petroleum products. The exclusive contracts which Standard Oil held covered 23% *60 of the total taxable gallonage in that market, involved 16% (almost 6,000) of the retail gasoline outlets there, and were responsible for 6.7% (about $58,000,000) of the total area sales. The issue was whether the Government had to prove violation of section 3 of the Clayton Act on a comparative basis by showing in fact that competitive activity had actually diminished or would probably diminish. Mr. Justice Frankfurter, doubting the court's ability to deal with the mass of economic data that the issue, so stated, would necessitate (see, in this connection, his surprising suggestion in note 13 of a possible double standard of statutory interpretation, depending on whether the Federal Trade Commission or the court was deciding the question), concluded that section 3 was satisfied "by proof that competition had been foreclosed in a substantial share of the line of commerce affected."
There was little more in the opinion to support this flat conclusion than the fact that Standard Oil's contracts covered a substantial number of outlets and involved a substantial amount of petroleum products and sales volume. The Clayton Act was held to apply despite Justice Frankfurter's passing observation that
"Requirements contracts, on the other hand, may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public. In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, requirements contracts may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and  of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified  offer the possibility of a predictable market. * * * They may be useful, moreover, to a seller trying to establish a foothold against the counter-attacks of entrenched competitors. * * *" (337 U.S., at pages 306-307, 69 S.Ct., at page 1058)
This is the view reflected in the dissenting opinion of Justice Douglas. Justice Jackson and two other justices also dissented, holding it was indispensable that the Government *61 establish as a fact that either the actual or probable effect of the accused arrangement was substantially to lessen competition or tend to create a monopoly. The only possible way for courts to arrive at a fair determination, they said, was to hear all relevant evidence from both parties  a tedious process, but without which a judicial decree would be nothing more than a "guess in the dark."
The reluctance of the Standard Oil 5-4 majority to grapple with the economic facts of the case was surprising in a court which had once been exposed to the "Brandeis brief" approach. The opinion has been characterized as "inadequately reasoned," Hart, "Foreword: The Time Chart of the Justices," 73 Harv. L. Rev. 84, 100 (1959), and otherwise been given a critical reception. See, for example, Lockhart and Sacks, "The Relevance of Economic Factors in Determining Whether Exclusive Arrangements Violate Section 3 of the Clayton Act," 65 Harv. L. Rev. 913 (1952), where the authors discuss factors courts should consider in passing upon exclusive arrangements; McLaren, "Related Problems of `Requirements' Contracts and Acquisitions in Vertical Integration Under the Anti-Trust Laws," 45 Ill. L. Rev. 141, 172 (1950): section 3 violations should be found "only when supported by the `substantial evidence' to be drawn from a realistic economic investigation and the fair conclusion that a particular arrangement probably will unduly restrict competition"; Sunderland, "Changing Legal Concepts in the Anti-Trust Field," 3 Syracuse L. Rev. 60, 80 (1951): courts "should revert to the rule of reason: avoid scare words, rules-of-thumb and a priori assumptions, and employ doctrines of automatic illegality only with the utmost of caution. The decision in each case that is brought shall depend upon whether, under all the facts and circumstances, it is shown that competition has in fact been unduly restrained"; Oppenheim, "Federal Antitrust Legislation: Guideposts to a Revised National Antitrust Policy," 50 Mich. L. Rev. 1139, 1180-81 (1952); Note 59 Mich. L. Rev. 1236 (1961).
*62 It took less than a dozen years to prove how unreasoned and unsatisfactory the Standard Oil decision was. There was opposition from the courts and federal trade commissioners, and from critics inside and outside the law. Finally, in Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), the Supreme Court moved in the direction of establishing more definite guidelines for determining whether an exclusive requirements contract violated the Clayton Act. Tampa Electric sought a declaratory judgment establishing that its contract with Nashville Coal for the purchase of all the coal required as boiler fuel at one of its Florida generating plants over a 20-year period was valid, and did not, as the coal producer claimed, violate section 3 of the Clayton Act. Both the District Court and the Court of Appeals held the contract invalid. The Supreme Court reversed in a 7-2 opinion, Justice Frankfurter joining in the majority view. There is no need to recite the factual details of the case; what is important is the first steps taken by the court toward setting up some explicit guidelines to be applied in section 3 cases. The following factors had to be taken into consideration:
"* * * First, the line of commerce, i.e., the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. Second, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. In short, the threatened foreclosure of competition must be in relation to the market affected. * * *
Third, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited * * *." (365 U.S., at pages 327-328; 81 S.Ct., at page 628, 5 L.Ed.2d, at page 587)
The majority further said:
"To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the *63 parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence." (365 U.S., at page 329, 81 S.Ct., at page 629, 5 L.Ed.2d, at page 588)
The majority held that neither of the lower courts had given the required effect to a controlling factor in the case, namely, the relevant competitive market: this omission alone required reversal. The court set the market as the entire area where defendant and other coal producers effectively competed, and not just the smaller area around Tampa Electric Company's site  neither peninsular Florida, nor the entire State of Florida, nor Florida and Georgia combined constituted the relevant market of effective competition. The court also pointed out that although, in the context of antitrust legislation, protracted requirements contracts may well be suspect, they have not been declared illegal per se. Even though a single contract between single traders might fall within the initial broad proscription of section 3 of the Clayton Act, "it must also suffer the qualifying disability, tendency to work a substantial  not remote  lessening of competition in the relevant competitive market."
The court in Tampa Electric did not find present a seller with a dominant position in the market, as in the Standard Fashion case, nor myriad outlets with substantial sales volume, coupled with an industry-wide practice of relying upon exclusive contracts, as in Standard Oil, nor a plainly restrictive tying arrangement as in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). On the contrary, the contract in question seemed to be only of that type which might well be of economic advantage to buyers as well as sellers, giving the buyer an assured supply while making possible substantial reduction of selling expenses on the part of the seller, thus providing protection against price fluctuations and offering the possibility of a predictable market. *64 The court did not find offensive the 20-year period of the contract that had been singled out as its principal vice  at least in the case of public utilities where the assurance of a steady and ample supply of fuel was necessary in the public interest.
Although Tampa Electric's doctrinal basis has been described as sufficiently flexible to avoid the uncompromising prohibition of the Standard Oil case, the problem of whether the effect of an exclusive arrangements contract "may be to substantially lessen competition" is capable of an even more refined analysis. See, for example, Bok, "The Tampa Electric Case and the Problem of Exclusive Arrangements under the Clayton Act," 1961 Supreme Court Review (Kurland, ed.), p. 285 et seq.
Suffice to say, the present case was decided without a single fact presented in support of the judgment. Counsel too readily accepted the suggestion posed in the trial court's question when they agreed that the issue could be decided simply as a matter of law. There was apparently no recognition on their part of the large dimension of the problem of an exclusive requirements contract considered in the light of N.J.S.A. 56:6-22(b). However, at least one basic aspect of that problem, requiring the taking of proofs, was called to the trial judge's attention in the course of the argument on Solar's motion for a rehearing when its counsel stated that the area of effective competition would have to be taken into account. This was warning signal enough to stay summary disposition of the matter.
The issue presented in this case is too important to the industry (and indeed to similar situations in our economy) to be disposed of on the ground so strongly urged upon the trial court by plaintiffs' attorney  that the 15-year arrangement clearly and of itself had the effect of a possible substantial lessening of competition. The trial judge apparently embraced that argument. It should be observed, however, that by citing the Gionti and Lewis cases he showed that he was assuming the very fact to be proved  that the leases ran *65 counter to N.J.S.A. 56:6-22(b) and so were void under N.J.S.A. 56:6-23.
Since our act involves the same considerations as section 3 of the Clayton Act, it is appropriate to apply, at the very least, the guidelines set out in Tampa Electric. Consideration should also be given to such diagnoses of the problem as are found in critical articles like those by Bok and by Lockhart and Sacks, cited above.
Finding, as we do, that this was not a case which should have been decided on the pleadings alone, but only after a complete factual exploration, the judgment is reversed and the case remanded for a full hearing.