## INTERNATIONAL SHOE CO. v. FEDERAL TRADE COMMISSION.

Circuit Court of Appeals, First Circuit.
November 27, 1928.

No. 2225.

Frank Y. Gladney and R. E. Blake, both of St. Louis, Mo. (J. D. Williamson, of St. Louis, Mo., of counsel; Clifford P. Warren, of Boston, Mass., on the brief), for petitioner.

Adrien F. Busick, Baldwin B. Bane, and A. R. Brindley, all of Washington, D. C. (Robert E. Healy, of Washington, D. C., on the brief), for the Commission.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This is a proceeding to review an order of the Federal Trade Commission directing the petitioner to divest itself of the stock of the W. H. McElwain Company, found to have been acquired in violation of section 7 of the Clayton Act (15 USCA § 18), and of the properties of said company taken over through such stock acquisition after the Commission had issued its complaint. Section 7 of the Clayton Act (38 Stat. 730, 15 USCA § 18) provides:

"That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

By section 11 (15 USCA § 21), it is provided that, after hearing, the Commission shall state its findings of fact and cause an order to be served requiring the respondent to cease and desist from the violation charged and found. This section also provides for a review by a court of appeals and that "the findings of the Commission * * * as to the facts, if supported by testimony, shall be conclusive."

The scope of this statute and of the reviewing proceeding have been clearly defined in recent authoritative decisions.

In United Shoe Machinery Co. v. United States, 258 U. S. 451, 459, 42 S. Ct. 363, 366 (66 L. Ed. 708), Mr. Justice Day says:

"The Sherman Act [15 USCA §§ 1–7, 15] and the Clayton Act [38 Stat. 730] provide different tests of liability. This was determined in the recent case of Standard Fashion Co. v. Magrane-Houston Co., ante [258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653]. In that case we pointed out that the Clayton Act was intended to supplement the Sherman Act, and within its limited sphere established its own rule."

And in Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653, the phrase "may be to substantially lessen competition" found in both sections 3 and 7, was dealt with as follows:

"Section 3 condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly. It thus deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only. But we do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly. That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial."

Otherwise stated, contracts dealt with by section 3 (15 USCA § 14) and stock

acquisitions referred to in section 7, are condemned where the effect creates a *reasonable probability*—not a mere possibility—that competition will be substantially lessened or a monopoly created. Compare Swift v. Federal Trade Commission (C. C. A.) 8 F.(2d) 595, 597; Federal Trade Commission v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993, and footnotes to Mr. Justice Brandeis' dissenting opinion, page 431 et seq. (40 S. Ct. 576 et seq.), quoting from the committee reports, etc., when the Clayton Act was under discussion in Congress. Federal Trade Commission v. Eastman Kodak Co., 274 U. S. 619, 47 S. Ct. 688, 71 L. Ed. 1238.

A recent and closely applicable decision is Federal Trade Commission v. Pacific Paper Association, 273 U. S. 52, 47 S. Ct. 255, 71 L. Ed. 534. In that case, the Circuit Court of Appeals for the Ninth Circuit [4 F.(2d) 457] had reversed paragraphs (b) and (c) of the order of the Commission, made on stipulated facts, from which the Commission found that the respondents had acted in violation of section 5 of the Federal Trade Commission Act. 38 Stat. 717 (15 USCA § 45).

But the Supreme Court reversed the Circuit Court of Appeals, holding (273 U. S. 63, 47 S. Ct. 258 [71 L. Ed. 534]) that "the weight to be given to the facts and circumstances admitted, as well as the inferences reasonably to be drawn from them, is for the Commission. Its conclusion that the habitual use of the established list lessens competition and fixes prices in interstate territory cannot be said to be without sufficient support."

■ The jurisdiction of this court to review is not broad and general; it is limited, somewhat narrowly, to the grounds prescribed in the statute.

Petitioner's learned counsel states, near the beginning of his brief, that there is no dispute about the facts, not a single conflict in the testimony of the witnesses, and that "the issue is nothing more than conflicting inferences, conclusions or opinions from the undisputed facts shown on the record."

This essentially accurate characterization of the bulky record of over 700 pages would, under the doctrine above stated in the Pacific Paper Association Case, warrant this court in dismissing the petition without substantial discussion of petitioner's contention—elaborated in a brief of over 100 pages—that the Commission's inferences were wrong. It is not seriously contended that any of the findings of fact of the Commission are unsupported by the testimony. Petitioner merely seeks to induce this court to hold the Commission wrong in its inferences from the facts, and on that ground alone to reverse the order.

■ Nevertheless, we have carefully examined the record and, the petitioner's two briefs, with the result that we find that the inferences of the Commission are not only reasonably drawn from undisputed facts, but that no other inferences could reasonably, be so drawn.

In brief outline the facts are as follows:

The International Shoe Company, with headquarters in St. Louis, grew out of a consolidation, some years ago, of three shoe-manufacturing concerns. In 1921 it owned and operated at least 32 shoe factories in Missouri, Illinois, and Kentucky, with a daily capacity of more than 70,000 pairs of shoes. It also owned tanneries. It manufactured a general line of leather shoes for men, women, boys, girls, and infants, and sold them in interstate commerce in practically all the states of the United States. The W. H. McElwain Company was then a Massachusetts corporation, with headquarters in Boston, owning and operating tanneries and shoe factories having a daily capacity of about 40,000 pairs, where it manufactured leather shoes for men, boys, and misses, which it sold in at least 35 states of the United States. It also owned, in whole or in part, several branches or distributing houses. Its main output were dress shoes for men, thus distinguished from work shoes. The petitioner was the largest shoe manufacturer in the United States, and the McElwain Company the largest in New England, and the fourth or fifth in the United States.

Both concerns started from small beginnings, had been well and aggressively managed, and had for over 20 years been expanding their output, both in varieties of shoes manufactured and in the territory in which they marketed their shoes. Both companies showed marked tendencies towards what has come to be called the "integration of the industry"; i. e., covering the field, from raw material (mainly hides) to actual wearer.

Paragraph 3 of the complaint reads:

"On or about May 11, 1921, while the International Shoe Company and the W. H. McElwain Company were engaged in commerce in competition with each other as aforesaid, the International Shoe Company acquired the whole, or substantially all, of the stock or other share capital of said W. H. McElwain Company, and still owns and controls such stock or share capital so ac-

quired. Such acquisition of such stock or share capital of the W. H. McElwain Company was contrary to law and violative of said Act of Congress approved October 15, 1914 (the Clayton Act), and especially section 7 thereof. The effect of the acquisition by the respondent of such stock or other share capital of the W. H. McElwain Company was, to wit.:

"(a) To substantially lessen competition between the W. H. McElwain Company, the corporation whose stock was so acquired, and the International Shoe Company, the corporation making the acquisition;

"(b) To restrain commerce in the shoe business in the several sections and communities of the United States in which the respondent and the said W. H. McElwain [Company] were engaged in business in interstate commerce, as aforesaid;

"(c) To tend to create in the respondent a monopoly in interstate commerce in the shoe business."

After hearing, the Commission on November 25, 1925, made a long report of its findings of fact, paragraphs 5 and 6 of which are as follows:

"Paragraph 5. The shoes produced by W. H. McElwain Company in 1921 and for some time prior thereto were sold to retail dealers at about six to nine dollars per pair. At the same time the International Shoe Company produced a line of men's dress shoes known as the 'Patriot' brand, and of that brand ten styles of low shoes and twenty-two styles of high shoes were similar in style, comparable in price, and equal or superior in quality to the men's high and low dress shoes produced by the W. H. McElwain Company. The 'Patriot' shoes manufactured and sold by respondent were sold to retailers at about the same price per pair as the shoes manufactured and sold by W. H. McElwain Company. Both companies made and sold medium priced dress shoes and sold such shoes to retail dealers in the same states, and in many of the same cities and towns, and in some instances to the same dealers. On and prior to May 11, 1921, both companies were engaged in manufacturing and selling leather dress shoes in commerce among the several states and the District of Columbia, in competition with each other, and with others similarly engaged. The competition in commerce between the two companies was substantial.

"Paragraph 6. Respondent is the largest manufacturer of leather shoes in the United States. In its catalogue for the spring and summer of 1921 respondent listed and described sixty-nine types or styles of low shoes and sixty-two types or styles of high shoes for women; thirty-nine types or styles of leather low shoes and seventy-six types or styles of leather high shoes for men; thirty-two styles or types of leather low shoes, and forty-five styles or types of leather high shoes for children; thirty-two styles or types of leather high shoes for boys; thirty-seven styles or types of leather shoes for infants, and sixty-one styles or types of leather high work shoes for men. In addition, respondent's catalogue listed and described about fifty varieties of cloth or canvas shoes, and sixteen varieties of rubber soled shoes."

The findings in these paragraphs are fully supported by the testimony, and are therefore conclusive on this court. The acquisition of the stock was admitted; concededly it eliminated all competition.

Petitioner seeks to escape from the findings, fully supported by testimony, and the fair inferences therefrom, to the effect that the two concerns were in substantial competition when the petitioner purchased all of the McElwain Company's stock (except 50 shares of first preferred and 35 shares of the common), by contending that the McElwain Company was then insolvent, in the sense that "it was unable to pay its debts as they became due," and that therefore it was no longer a potential or prospective competitor.

The Commission expressly found that the McElwain Company was not insolvent within the Bankruptcy Act definition. Plainly it was not. After weeks of negotiation, petitioner's executive officers—undoubtedly as competent a set of shoe manufacturers as there are in the world—concluded that the McElwain Company's equity, above its debts of some $17,000,000, was $9,460,832.50; it purchased the stocks on that basis, after inventory, appraisal, and audit of the McElwain Company's assets. The McElwain Company's capital stock then outstanding was: First preferred, par value $6,993,100, mostly held by the investing public; second preferred stock, $2,600,000, largely held by the employees and officials of the company; and the common stock, $3,494,800, mainly held by the executive staff.

While the McElwain Company had suffered substantial losses in the tremendous slump in prices of 1920–21, there is no foundation whatever for the petitioner's contention that (except for this purchase) the concern would have gone out of existence, and therefore out of competition with the petitioner. On the contrary, there were several

alternatives—all reasonable and inconsistent with the petitioner's theory that the McElwain Company's losses suffered, and consequent shortage of working capital, would (except for the merger with petitioner) have put it out of the shoe-producing business. Some of these alternatives are:

(a) The McElwain Company's bank creditors might have carried the concern, just as at that time the banks were carrying a very large percentage of the business concerns in this community. It was a period of "frozen credits," a time when there was practically a conceded moratorium to a large share of our business concerns, which competed fiercely for rehabilitating trade.

(b) If a receivership had been found a necessary expedient, competition under receivership management would have been likely to be intensified, not eliminated.

(c) In case of actual bankruptcy, the holders of the preferred stock (one or both classes) would in their own interest have taken over the property, kept it in active operation, and therefore in competition.

To hold, as petitioner's counsel ask this court to hold, that the Commission was bound to draw the inference that the McElwain Company's financial condition was such that it would have ceased to be a competitor of the International in the shoe business, would be for the court, ultra vires, to substitute a highly speculative prophecy for the Commission's fair and soundly-grounded contrary inference.

About two years after this purchase, in May, 1923, the Commission filed this complaint, alleging violation of section 7 of the Clayton Act. On July 5, 1923, the petitioner filed its answer; the fourth paragraph of this reads as follows:

"Fourth. And further answering respondent would respectfully show the Commission that upon receipt of the complaint, and upon being advised that there was a possible technical violation of section 7 of the Clayton Act, in its acquisition and ownership of the share capital of W. H. McElwain Company, this respondent took the necessary steps to remedy any such technical violation; that it has divested itself of any and all stock or share capital of W. H. McElwain Company; that it does not now own or control any stock or share capital of said W. H. McElwain Company; and that no officer, director, or stockholder of respondent owns or controls any stock or share capital of said W. H. McElwain Company. Therefore, the premises considered, this respondent respectfully asks that this complaint be dismissed."

This divestment, it is admitted, was nothing but an absorption by the petitioner of the assets of the McElwain Company, carried through by petitioner by putting the stocks into the hands of dummies, who passed the requisite votes and signed the papers. The Commission was fully warranted in finding that "the transactions * * * were not bona fide * * * and that the transfer to the respondent of the assets, properties, rights and privileges of the W. H. McElwain Company was a mere artifice and subterfuge to evade said act of Congress." The best that petitioner's counsel is able to say in defense of this transaction is that it did not deceive the Commission.

The Commission's report and order were filed on November 25, 1925. The order required the International Company to submit within 60 days a plan of compliance. The effective date was thereafter on the petitioner's application extended from time to time, and then suspended until the Supreme Court should announce its decision in the case of Thatcher Mfg. Co. v. Federal Trade Commission, then before that court on certiorari. The Thatcher Case was decided November 23, 1926 (272 U. S. 554, 47 S. Ct. 175, 71 L. Ed. 405), after which petitioner sought and obtained a full rehearing upon the merits. The case was reargued on March 18, 1927; on May 7, 1927, the Commission reaffirmed its former position, thus making the effective date of the Commission's order May 7, 1927. Thereafter, the petitioner submitted a plan of compliance which was disapproved on June 30, 1927. The petition was filed in this court on March 3, 1928.

This history makes it fairly clear that the petitioner's attempt to transmute its acquisition of the stocks into an acquisition of the assets must have been grounded on the advice of counsel that the original purchase and holding were illegal, and on the hope that the Supreme Court in the Thatcher Case would hold such acquisition of the assets, although after complaint filed, effective to oust the Commission's jurisdiction. The Supreme Court did not so hold. A bare majority of the court held that the Commission's order and the decree below should be reversed (as to the main portion) on the ground that the purchasing corporation had used its stock control in order to obtain the transfer of the business and assets *before the Commission had instituted proceedings*. The court, by Mr. Justice McReynolds, said:

"The act has no application to ownership

of a competitor's property and business obtained prior to any action by the Commission, even though this was brought about through stock unlawfully held. * * * If purchase of property has produced an unlawful status, a remedy is provided through the courts. * * * The Commission is without authority under such circumstances."

This ruling evoked a dissent from Mr. Justice Brandeis, concurred in by the Chief Justice, Mr. Justice Holmes, and Mr. Justice Stone, who were of the opinion that the Commission could deal effectively with the matter, even although through the stock the purchasing company had obtained the assets of its competitors before the institution of the proceeding before the Commission under section 7.

Neither opinion leaves petitioner a chance to argue that this pseudo purchase of assets after complaint filed has affected the Commission's jurisdiction.

Another groundless contention of the petitioner is "that in substance and reality the purchase was one of assets and business." It was not. The petitioner refused to have anything to do with the merger on the basis of purchasing assets and business; it not only insisted upon the purchase of the stocks, but insisted that the purchase price, nearly $9,500,000, should be so divided among the three classes of stocks as to require a sacrifice of 17½ per cent. (about $1,220,000) from par by the holders of the first preferred (the investing public), and 25 per cent. (about $650,000) by the second preferred; in order that the holders of the common stock—which had been wiped out by the losses—might obtain 50 per cent. The common stock then had the voting power and was held mostly by the executive forces; the purchaser wanted, for obvious business reasons, to retain the effective managerial forces of this concern in good courage and friendly attitude, when undertaking long-distance management of the McElwain Company's great business. The motives on both sides to put through a merger so advantageous to voters in the selling company are obvious.

Finally, petitioner argues that no such case of monopoly or damage to the public interest is made out as would ground a case under the Sherman Act. A sufficient answer is that the case is not brought under the Sherman Act, but under the Clayton Act, and "the Sherman Act and the Clayton Act provide different tests of liability." United Shoe Machinery Co. v. United States, supra.

The order of the Federal Trade Commission is affirmed.