## SIGNODE STEEL STRAPPING CO. v. FEDERAL TRADE COMMISSION.

### No. 4896.

Circuit Court of Appeals, Fourth Circuit.

Nov. 20, 1942.

Adrien F. Busick, of Washington, D. C., and Charles M. Price, of Chicago, Ill. (Davies, Richberg, Beebe, Busick & Richardson, of Washington, D. C., and Scott, MacLeish & Falk, of Chicago, Ill., on the brief), for petitioner.

Joseph J. Smith, Jr., Asst. Chief Counsel, Federal Trade Commission, of Washington, D. C. (W. T. Kelley, Chief Counsel, and George W. Williams, J. B. Truly, and James W. Nichol, Sp. Attys., Federal Trade Commission, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and NORTHCOTT, Circuit Judges.

PARKER, Circuit Judge.

This is a petition to set aside an order of the Federal Trade Commission directing the Signode Steel Strapping Company to cease and desist from incorporating in any contract for the lease or sale of its machinery, tools or appliances, or enforcing or continuing in operation or effect, any condition, agreement or understanding to the effect that the lessee or purchaser thereof shall not use with same any wire or strapping not acquired from the company. The Commission has filed answer asking the en·

forcement of the order. Similar orders were made by the Commission against the Acme Steel Company and the Gerrard Company, which together with the Signode Company control from two thirds to three fourths of the type of tool leasing business in which the Signode Company is engaged; but these orders are not before the court in this proceeding.

The Signode Company's principal business is the sale of steel strapping and wire suitable for use in making packages or shipping units. Its sales of these commodities in the years 1936, 1937 and 1938 amounted to $2,197,346.95, $2,623,271.24 and $1,759,085.42, respectively. It is also engaged in renting to its customers machines, tools and appliances for stretching and fastening this strapping and wire in the making of the packages or shipping units. For the smaller tools it requires a deposit of $25 per tool, which is refunded when the tool is returned, less 10% for each quarterly period that the tool is used. For the larger tools and appliances it collects an annual service charge of from $5 to $50. Automatic electric wire tying machines are leased at from $100 to $1,500 per year. Its income from the rentals of these machines, tools and appliances, other than wire tying mediums, for the years 1936, 1937 and 1938 was $63,862.02, $94,672.22 and $86,640.01, respectively; and its income for the same years from rentals and deposits on automatic wire tying machines was $25,235, $87,575 and $55,300, respectively. The lease agreements contain the condition or stipulation that the lessee will not use the machines, tools or appliances leased except with strapping or wire acquired from the company.

It is not disputed that the company is engaged in interstate commerce. It is one of about one hundred companies selling wire and strapping for the purpose of making packages and does from 5% to 7% of the business in this field. It is one of twelve companies engaged in the sale or leasing of tying machines or appliances; and the gross volume of business done by these companies, including the sale of wire and strapping, amounts to approximately nine million dollars annually. Two thirds to three fourths of this business, however, as above indicated, is done by the company here and the Acme Steel Company and the Gerrard Company. The company does from twenty to thirty per cent of the total volume of the business done by these twelve

companies. The line of commerce here pertinent, however, as the Commission admits in its brief, is the sale of wire and strapping for the purposes of binding packages, and not the sale or leasing of tools or machines; for the lessening of competition complained of relates not to the sale or leasing of tools or machines, but to the sale of wire and strapping for use therein.

The Commission made the following findings with respect to the lessening of competition which results from the incorporation of the condition or stipulation with respect to the use of wire and strapping acquired from the company, viz.:

"Paragraph three: There are in the United States other corporations, and individuals, firms and partnerships, who have been and are engaged in the sale, in commerce among and between the various states of the United States and in the District of Columbia, of steel strapping and wire suitable for use in and with respondent's machines, appliances and tools. But for the restrictive conditions in respondent's lease contracts, as hereinafter set forth, respondent would have been and would now be in active and substantial competition with such corporations, individuals, firms and partnerships in the sale of steel strapping and wire to the lessees of respondent's machines, appliances and tools.

"Paragraph nine: There is on the market an ample supply of steel strapping and wire suitable for use in or with respondent's machines and appliances, such strapping and wire being for sale both by concerns which sell or lease tying machines and by concerns which do not sell or lease such machines. These concerns are prepared to and have attempted to sell such strapping and wire to lessees of respondent's machines and appliances, but have found themselves precluded from such sale by reason of the restrictive conditions in respondent's lease contracts.

"Paragraph ten: The commission finds that the practice of respondent in requiring that the lessee of its machines and appliances use in or with such machines and appliances no wire or strapping other than that supplied by respondent, results in the exclusion from the market of numerous parties who, in the absence of such restrictions, would be prospective and potential purchasers of tying wire and strapping from respondent's competitors. Competition in the tying wire and strapping market is restricted and contracted in direct pro-

portion to the extent to which respondent is successful in leasing its machines and appliances under agreements containing such restrictive conditions."

These findings are supported by paragraph one of part two of the stipulation of facts, which is as follows: "Paragraph one: There are in the United States, and have been during the time respondent has been in business, a substantial number of other corporations, firms, partnerships and individuals who have been and are engaged in the sale of steel strapping and wire in commerce among and between the several states and territories thereof and the District of Columbia, and who are unable to sell steel wire and strapping to lessees of respondent's tools, appliances and machines in cases where respondent's lease limits the use of the tool, appliance or machine to the strapping or wire of the respondent."

One of the contentions of the company before the Commission as well as here was that, since there were so many ways of preparing packages and since the use of wire and strapping with tools constituted so small a part of the general tying field, the practices of the company could have no substantial effect upon competition therein. The Commission rejected this contention, holding that the use of wire and strapping with tying machines constituted a distinct line of commerce within the meaning of the Clayton Act and that the effect of the restrictive conditions inserted by the company in its leases was "to substantially lessen" competition in that line of commerce. The pertinent paragraphs of the findings are as follows:

"Paragraph thirteen: The Commission is of the opinion from the evidence, and finds, that the tying machine industry constitutes a field distinct from the general tying field, and that it is a line of commerce within the meaning of the Clayton Act.

"Paragraph fourteen: While the restrictive conditions in respondent's contracts do not expressly provide that the lessees of respondent's machines, appliances and tools shall not use the wire and strapping of respondent's competitors, the practical effect of such conditions is to preclude such lessees from using such wire and strapping. The Commission further finds that the effect of such restrictive conditions, under the circumstances set forth herein, has been, is, and may be, to substantially lessen competition in the aforesaid line of commerce.

Such effect is materially increased by reason of the fact that it forms a part of the cumulative effect of the practices of the three leading companies in the tying machine industry upon competition in said line of commerce."

■ The company argues that the findings last quoted relate to the sale or lease of machines, or at least to the sale of wire and strapping by companies that sell or lease machines, and not to the sale of wire and strapping suitable for use therein, and that consequently the Commission has failed to make the essential finding of substantiality in the lessening of competition in the line of commerce involved. The Commission in its brief says that it did not intend to make any such finding as suggested by the company, and agrees that the line of commerce involved is the sale of wire and strapping for making packages or shipping units. We think that this is the reasonable interpretation of the findings. The words "tying machine industry" were manifestly used for "machine tying industry", having reference to the use of machines with wire and strapping in the making of packages. Paragraphs eleven and twelve had dealt with the general tying field in which rope, twine, etc., were used; and the manifest purpose of paragraph thirteen was to distinguish from this general tying field the use of wire and strapping in connection with the use of tying machines. The words "tying machine industry", therefore, should be taken to refer to this, and not to the business of selling or leasing tying machines or to the sale of wire and strapping only by those engaged in selling or leasing such machines. The practices complained of could not have lessened competition in the sale or leasing of the machines; and if the meaning which the company seeks to give the findings last above quoted were the meaning intended, there would have been no reason for the Commission to make findings three, nine and ten quoted above, which relate to the effect of the restrictive conditions on competition in the sale of wire and strapping, the ninth finding referring expressly to sales by concerns which do not sell or lease machines.

The order of the Commission was entered under section 3 of the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 14, which is as follows: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise,

machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The contentions of the company are (1) that the restrictive conditions contained in its lease contracts do not fall within the prohibition of the act, and (2) that their effect is not "to substantially lessen competition" in a line of commerce within its meaning. Neither of these contentions, in our opinion, can be sustained.

The company's position on its first contention is that the restrictive conditions contained in its lease contracts do not forbid the use of wire and strapping supplied by its competitors and that the use of its machines, tools and appliances by customers to whom they are furnished is not a practical necessity, so as to justify a finding that the practical effect of the restrictive conditions is to preclude the use of wire and strapping supplied by its competitors. For this position it relies upon the fact that machines, tools and appliances are comparatively inexpensive and can be obtained by its customers from other dealers without difficulty and without great expense.

The answer to this position is that the users of appliances of this sort will not in most cases care to equip themselves with more appliances than are necessary for their purposes and, having obtained from the company those that are necessary, will not be willing to incur the additional expense of acquiring others to do the same work. Evidence is stipulated that approximately two thirds of the company's customers purchase annually from the company less than 600 pounds of wire and strapping and that the average billing to each such customer is approximately $30 per year; and that approximately 95% of its customers purchase annually less than two tons with an average annual billing of approximately $50. Certainly customers using quantities no greater than these would not feel justified in acquiring more than one set

of tools and appliances; and the estimate in the stipulation is that only around 25% of the customers of the company have in their possession tools or appliances supplied by others. This means necessarily that most of those customers of the company who have leased its tools and appliances will, as a practical matter, be precluded from purchasing wire and strapping from other persons, since they cannot be used with the appliances leased from the company. Directly in point, we think, is the decision of the Supreme Court in International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 703, 80 L. Ed. 1085, in which it was held a violation of section 3 of the Clayton Act for the lessor of machines to require that only cars of its manufacture be used therein. The court said: "Little need be said of the contention that the condition of appellant's leases does not infringe these prohibitions [of the Clayton Act]. It is true that the condition is not in so many words against the use of the cards of a competitor, but is affirmative in form, that the lessee shall use only appellant's cards in the leased machines. But as the lessee can make no use of the cards except with the leased machines, and the specified use of appellant's cards precludes the use of the cards of any competitor, the condition operates in the manner forbidden by the statute. See United Shoe Machinery Co. v. United States, 258 U.S. 451, 457, 458, 42 S.Ct. 363, 66 L.Ed. 708."

■■ In paragraph one of part two of the stipulation quoted above, evidence is stipulated to the effect that other dealers in wire and strapping are unable to make sales to lessees of the company's appliances who hold leases containing the restrictive conditions; and in the tenth paragraph of the Commission's findings is the finding that "competition in the tying wire and strapping market is restricted and contracted in direct proportion to the extent to which respondent is successful in leasing its machines and appliances under agreements containing such restrictive conditions". It was to meet practices leading to such a result, we think, that section 3 was incorporated in the Clayton Act. Such restrictive covenants as contained in the company's leases tend to hamper competition and to create monopolies; and Congress, in the exercise of its power to regulate interstate commerce, was striking at practices of this sort as unfair trade practices which should be eliminated because of

their tendency. As said by Mr. Justice Day in Standard Fashion Co. v. Magrane Houston Co., 258 U.S. 346, 356, 42 S.Ct. 360, 362, 66 L.Ed. 653:

"The Clayton Act sought to reach the agreements embraced within its sphere in their incipiency, and in the section under consideration to determine their legality by specific tests of its own which declared illegal contracts of sale made upon the agreement or understanding that the purchaser shall not deal in the goods of a competitor or competitors of the seller, which 'may substantially lessen competition or tend to create a monopoly.' * * *

"Section 3 condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly. It thus deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only. But we do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly. That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial."

■ And concerning the function of the Commission in applying the act Mr. Justice Brandeis used the following pertinent language in his dissenting opinion in Federal Trade Commission v. Gratz, 253 U.S. 421, 435, 436, 40 S.Ct. 572, 577, 64 L.Ed. 993: "Instead of attempting to inflict punishment for having done prohibited acts, instead of enjoining the continuance of prohibited combinations and compelling disintegration of those formed in violation of law, the act undertook to preserve competition through supervisory action of the commission. The potency of accomplished facts had already been demonstrated. The task of the commission was to protect competitive business from *further* inroads by monopoly. It was to be ever vigilant. If it discovered that any business concern had used any practice which would be likely to result in public injury—because in its nature it would tend to aid or develop into a restraint of trade—the commission was directed to intervene, before any act should be done or condition arise violative of the Anti-Trust Act. And it should do this by filing a complaint with a view to a thorough investigation; and, if need be, the issue of an order. Its action was to be prophylactic. Its purpose in respect to restraints of trade was prevention of diseased business conditions, not cure."

■ The company contends that its appliances are leased to its customers as a trade service for the purpose of facilitating the use of its wire and strapping, and, in support of the condition of the lease restricting their use to that purpose, relies upon the decision of the Supreme Court in Federal Trade Commission v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746, in which it was held not a violation of the act for an oil company to lease gasoline pumps to a retail dealer in gasoline on condition that they be used only with gasoline supplied by the lessor. In that case, however, the leased equipment was to be used in connection with the sale of the lessor's product; here it is to be used by the ultimate consumer of the product. There, the limitation on the use of the equipment was necessary to prevent a fraud upon the lessor and the public, as the use of the pumps in the sale of gasoline carried the implied representation that it was the gasoline of lessor that was being sold; and as said in Oxford Varnish Corporation v. Ault & Wiborg Corp., 6 Cir., 83 F.2d 764, 767, "The clear purpose of the Clayton Act * * * is to preserve legitimate competition, not to penalize efforts reasonably directed to safeguard against unfair competition. It is the proverbial 'shield' of the fair trader, not the 'sword' of his unfair competitor." No such limitation is necessary or appropriate here to guard against unfair competition; and the conclusion is inescapable that it serves no purpose except to exclude lessor's competitors from making sale of wire and strapping to its customers and is resorted to solely for that purpose. The Sinclair case was distinguished in International Machines Corp. v. United States, supra, 298 U.S. 131, 135, 56 S.Ct. 701, 703, 80 L.Ed. 1085 in which the Supreme Court emphasized that the only use made of the gasoline in the Sinclair case was "to sell it" and that there was no restraint upon the purchase and sale of competing gasoline. Here, as we have seen, there is a practical restriction upon the purchase and use of competing wire and strapping.

■ On the company's second contention, we cannot say that the Commission's

finding of substantial lessening of competition is without support in the record. The line of commerce involved is, as stated, the sale of wire and strapping for use in tying machines, but the company does business in this line of commerce throughout the nation and the volume of its sales through the three years under consideration exceeded an annual average of $2,000,000. The presence of the restrictive condition in its leases necessarily means that the larger part of this large volume of trade was practically tied up or at least removed from the normal influence of competition. And as pointed out by the Commission, the effect of the trade practice of the company is materially increased by reason of the fact that it forms a part of the cumulative effect of the practices of the three leading companies in the tying machine industry, all three of whom were subjected to orders by the Commission. The fact that these three companies controlled from two thirds to three fourths of the business done by the tying machine industry and a considerable percentage of the total business in wire and strapping sold for packaging goods, and that the restrictive conditions of their leases interfered with the normal operation of competition in so large a volume of trade, was sufficient justification, without more, for the finding that the lessening of competition resulting from the restrictive conditions was substantial, within the meaning of the act.

■ There is reason in the position that the substantiality of the lessening of competition is to be judged with reference to the effect of the trade practice upon the volume of business controlled by the person engaging in it, not with reference to the proportion which that business bears to the entire volume of such business throughout the country. Oxford Varnish Corp. v. Ault & Wiborg Corp., supra. If a dealer by such unfair trade practice as is here involved restrains competition with respect to his customers, he ought not be permitted to continue it because his portion of the national business is small; and we do not think that such was the intention of Congress in the requirement of the Clayton Act that the lessening of competition be substantial. Cf. N. L. R. B. v. Fainblatt, 306

U.S. 601, 606, 59 S.Ct. 668, 83 L.Ed. 1014. We need not decide this point, however, as we are of opinion that, even though the sales of wire and strapping throughout the country be considered, it cannot be said that the findings of the Commission as to substantial lessening of competition are without support in the record.

The company makes a special contention with respect to its large automatic wire tying machines. It says that since the Summer of 1938 it has entered into contracts for the sale of wire which give to the customers an option to lease a number of the machines. It appears, however, that the rental contract covering the machines contains a provision that the customer will use in the machines "only wire ordered and secured" from the company. Whether the execution of such rental contracts is required of those who exercise the option to lease contained in the sales contracts is not clear; but, if the condition forbidden in the order of the Commission is not made a part of such contracts, the order will not, of course, apply to them. It is significant, however, that prior to 1938 contracts for the sale of wire required customers to purchase their entire requirements from the company. The company amended this form of contract to eliminate this requirement, sending to customers a letter to that effect, which, however, made clear that the machines leased were to be used only with the wire supplied by the company, saying: "It was not and is not our intention to so interpret our contract (i. e. as requiring customers to purchase their entire requirements from the company); all we expect is that machines placed by us shall be used with wire supplied by us". As stated, however, if the restrictive condition is not made a part of the leases of the automatic wire tying machines, the order of the Commission will not apply to them, since its command is that the company cease from leasing, etc., its machines and appliances upon such condition, agreement or understanding, or enforcing such condition, agreement or understanding or continuing it in operation or effect.

For the reasons stated, the order of the Commission will be enforced.

Order enforced.