## JUDSON L. THOMSON MFG. CO. v. FEDERAL TRADE COMMISSION.

No. 3986.

Circuit Court of Appeals, First Circuit.

July 31, 1945.

H. LeBaron Sampson, of Boston, Mass. (Andrew Marshall, of Boston, Mass., of counsel), for petitioner.

Joseph J. Smith, Jr., Asst. Chief Counsel, and W. T. Kelley, Chief Counsel, both of Washington, D.C., and Carl Wheaton, Sp. Atty., of Columbia, Mo., for respondent.

Phipps, Durgin & Cook and Robert A. B. Cook, all of Boston, Mass., for Tubular Rivet & Stud Co., amicus curiæ.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This is a petition to set aside an order of the Federal Trade Commission charging the Judson L. Thomson Manufacturing Company with violation of § 3 of the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 14; and directing it to cease and desist from: "Leasing, selling * * * automatic rivet-setting machines on the condition, agreement or understanding that the lessee or purchaser thereof shall not use in or with such machine any rivets other than those acquired from [Thomson] * * *," and from enforcing or continuing to enforce such conditions or agreements already made. The Commission has filed a cross-petition asking for enforcement of the order.[1]

The facts as found by the Commission may be summarized as follows:

The petitioner is engaged in the business of manufacturing and selling tubular and bifurcated rivets, and in manufacturing, leasing and servicing automatic rivet-setting machines for the setting of such rivets. Its business is interstate in character and it is in competition with numerous other companies. Tubular and bifurcated rivets are sold to two classes of customers—in the industrial field where manufacturers use them in the assembling of their products, and in the carton or jobbing trade where they are sold through mail-order houses and hardware jobbers for replacement and repair purposes. Automatic feed-setting machines are usually used in the industrial field to set rivets. In the carton or jobbing trade, however, such machines are not used. There some rivets are set in small hand feed machines and some in special brake lining machines. In the United States there are eight companies engaged in selling tubular and bifurcated rivets and in supplying automatic machines with which to set them. At the time the complaint in this proceeding was filed each of the eight companies was leasing machines on the condition that its lessees would not use such machines for setting any rivets other than those manufactured and supplied by the lessor.

The use of tubular and bifurcated rivets for industrial purposes began about 1889. Until 1914 the petitioner and the Tubular Rivet and Stud Company were the only companies engaged both in selling such rivets and supplying machines for setting them. It has been the practice with both companies to lease machines and not to sell them. At the present time the petitioner and Tubular have approximately 8,000 and 7,000 machines respectively outstanding on lease. The Penn Rivet Corporation, which entered the field about 1914, has approximately 500 machines outstanding on lease and has sold in excess of 2,000 machines. The Edwin B. Stimpson Company started manufacturing machines about 1922 and has approximately 2,000 machines on lease and has sold approximately 300. The Chi-

---

cago Rivet and Machine Company started supplying machines between 1924 and 1928. It has between 800 and 1000 machines outstanding on lease and has sold in excess of 3,000. The remaining three companies which entered the field between 1927 and 1930 have approximately 300 machines outstanding on lease and have sold some 600 machines. All together the six companies have approximately 19,000 machines outstanding on leases. Substantially all of them are "tied" machines,[2] that is, machines in which the lessee may only use rivets supplied by his lessor. The companies have sold approximately 6,000 machines since they have been in business. The petitioner as lessor of some 8,000 machines controls approximately 42% of the leased machines, or 32% of all machines in the industrial field. In 1939 the total volume of business done by the eight companies was about $5,180,000. Of this amount the petitioner and Tubular each accounted for approximately 25%; Chicago accounted for approximately 20%; and the remaining five companies accounted for 30%

The petitioner confines its sales of rivets to the industrial field and does not sell to the carton or jobbing trade. To increase the sale of rivets its practice has been to supply machines for use in setting them. These machines which it does not sell are leased at a yearly rental of from $15 to $25 for the average size machine. These leases may be cancelled on ten days notice by either party. If the lessee uses a certain number of rivets—usually from 150,000 to 300,000, dependent on the type of the machine—the rental is rebated. The petitioner does not charge for servicing its machines, or, with the exception of disappearing-point anvils which wear out rapidly, for replacing parts. The prices for rivets charged by the petitioner run about 10% higher than the prices of similar rivets on the open market.

The Commission found that the primary purpose of leasing machines is to enable the petitioner to sell tubular and bifurcated rivets with such machines. It further found that there was on the open market an ample supply of rivets for use in the petitioner's machines sold both by companies which supply machines and which do not supply machines. Such concerns are precluded from selling to the petitioner's lessees by reason of the restrictive provisions in its leases. The Commission acknowledged the fact that the petitioner manufactures rivets of various sizes and shapes, many of them specially designed for special machines, but found that any competent rivet manufacturer could duplicate and supply such rivets. It referred to five concerns which manufacture rivets but do not supply machines. The gross sales of these concerns was some $475,000 in 1939 and were more or less confined to the hardware and jobbing trade in which rivet-setting machines are not used. By reason of the restrictive lease they are precluded from making much headway in the industrial field.

Therefore the Commission found that the practice of the petitioner "in requiring that the lessees of its rivet-setting machines use in or with such machines no tubular or bifurcated rivets other than those supplied by the [petitioner], results in the exclusion from the market of numerous parties who, in the absence of such restrictions, would be prospective and potential purchasers of tubular and bifurcated rivets from [petitioner's] competitors. Competition in the tubular- and bifurcated- rivet market is restricted and contracted in direct proportion to the extent to which [petitioner] is successful in leasing its rivet-setting machines under agreements containing such restrictive conditions * * *." [Further] "The Commission * * * finds that the effect of such restrictive conditions under the circumstances set forth herein has been, is, and may be to substantially lessen competition in the sale of tubular and bifurcated rivets."

As it applies in this proceeding, § 3 of the Clayton Act prohibits leasing machines on the condition, agreement or understanding that the lessee shall not use rivets of competitors, if competition in the sale of rivets may be substantially lessened thereby. Two questions are presented: (1) does the petitioner's tying clause prohibit the use of a competitor's rivets within the meaning of § 3; and (2) has the use of the tying clause substantially lessened competition? If the Commission's order is to be enforced both questions must be answered in the affirmative.

With respect to the first point the petitioner contends that the complaint and findings of the Commission do not state that the petitioner has leased its machines on the condition that the lessees shall not

---

[2] It appears that the Chicago Rivet and Machine Company has leased a few machines without any restrictions on what rivets are used in them.

use rivets of competitors, but merely that the leases are on the condition that the lessees shall not use the leased machines for setting any rivets other than those supplied by the petitioner; that this is neither an allegation nor a finding that the petitioner requires its lessees not to use rivets of competitors; and that the uncontradicted testimony shows that there are no such agreements, that lessees frequently do use rivets of competitors in machines supplied by competitors, that they can obtain satisfactory machines and rivets from a number of competitors, that the machines fundamentally are alike and have no patented features, that their lessees are free to choose between securing machines and rivets under a leasing plan and purchasing machines and rivets separately, and that they have several sources on which to rely under either plan.

The lease form used by the petitioner provides that the machines "shall at all times remain and be the sole and exclusive property" of the petitioner, that the lessee "shall have no right of property therein, but only the right to use the same" and "shall not use or allow said leased machinery to be used for setting any other rivets than those made by" the petitioner. § 3 of the Clayton Act provides:

"It shall be unlawful for any person * * * to lease * * * machinery * * * whether patented or unpatented, * * * on the condition, agreement, or understanding that the lessee * * * shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor * * * where the effect of such lease * * * or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

■ The terms of the petitioner's lease tie its rivets to its leased machines. Lessees are precluded from using a competitor's rivets with such machines. That is clearly a limitation upon the "use" of competitors' supplies within the broad terms of the statute. We entertain no doubt that the condition in question here falls within the purview of § 3. As was pointed out in

Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 355, 356, 42 S.Ct. 360, 362, 66 L.Ed. 653:

"The Clayton Act, as its title and the history of its enactment discloses, was intended to supplement the purpose and effect of other anti-trust legislation, principally the Sherman Act of 1890 [15 U.S.C.A. §§ 1-7, 15 note]. * * * The Clayton Act sought to reach the agreements embraced within its sphere in their incipiency, and in the section under consideration to determine their legality by specific tests of its own which declared illegal contracts of sale made upon the agreement or understanding that the purchaser shall not deal in the goods of a competitor * * * which 'may substantially lessen competition or tend to create a monopoly.' * * *

"Section 3 condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly. It thus deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only."

■ Congress passed the Clayton Act, 38 Stat. 730, to promote competition by protecting it from certain practices which might lessen it or tend to create a monopoly. § 3 strikes at practices relied on to limit competition in the distribution of goods which restrict the right to deal in competing products. Among these are the so-called "exclusive dealing arrangement" and the "tying contract." The former involves the condition that the purchaser or lessee of goods shall deal only in the goods of the seller or lessor and refrain from dealing in the goods of competitors; the latter involves a condition that the goods sold or leased shall be used only with other goods of the seller or lessor, the purchaser or lessee agreeing not to deal in such other goods of competitors, or, as in this case, the leasing of equipment on the condition that it shall be used only with the supplies of the lessor. Where the effect of such arrangements "may be to substantially lessen competition or trend to create a monopoly" they are made unlawful.[3]

■ The petitioner contends that a lease

---

[3] The Committees of both the House and the Senate called the tying clause an "unfair trade practice" which was "monopolistic in its effect" and required the surrender of a right which every dealer should enjoy, namely, the right to deal in any manufacturer's product he saw fit to handle. H. R. Report No. 627, 63rd Cong., 2nd Sess. (1914) 11; Senate Report No. 698, 63rd Cong., 2nd Sess. (1914) 6.

to fall within the purview of the statute must in the light of the surrounding circumstances have the practical effect of prohibiting the use of machines or supplies of competitors. We do not agree. In the view we take of the statute the practical effect of the use of the tying clause relates to the question whether the clause substantially lessens competition. Where the courts have used the expression "practical effect" they have had in mind two things— (1) the form in which the condition is expressed and (2) the effect of the clause on competition. The first may be illustrated by reference to a condition that the lessee shall use only the lessor's supplies. That has the practical effect and is the same thing as a condition that the lessee shall not use the supplies of competitors. The condition in the lease under consideration which requires lessees to use in the lessor's machines only rivets furnished by such lessor has the practical effect of precluding the use of the rivets of competitors in those machines. In United Shoe Machinery Corporation v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708, a case involving leases of patented shoe machinery, one of the provisions enjoined was a condition that the lessee should purchase all his supplies used in connection with such machinery from the lessor. The court said, 258 U.S. at page 457, 42 S.Ct. at page 365, 66 L.Ed. 708:

"While the clauses enjoined do not contain specific agreements not to use the machinery of a competitor * * * the practical effect of these drastic provisions is to prevent such use. We can entertain no doubt that such provisions as were enjoined are embraced in the broad terms of the Clayton Act, which cover all conditions, agreements or understandings of this nature. That such restrictive and tying agreements must necessarily lessen competition and tend to monopoly is, we believe, equally apparent." *

In International Business Machines Corporation v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085, the court invalidated a lease of a patented tabulating machine which provided that the lease should terminate in case cards not manufactured by the lessor were used in the leased machine. The lease agreement did not forbid all use of a competitor's supplies; these could still be used, consistently with the lease, in machines supplied by a competitor. The court said (298 U.S. at page 135, 56 S.Ct. 703):

"Little need be said of the contention that the condition of appellant's leases does not infringe these prohibitions. It is true that the condition is not in so many words against the use of the cards of a competitor, but is affirmative in form, that the lessee shall use only appellant's cards in the leased machines. But as the lessee can make no use of the cards except with the leased machines, and the specified use of appellant's cards precludes the use of cards of any competitor, the condition operates in the manner forbidden by the statute."

The petitioner argues that in the light of the circumstances surrounding the United Shoe and the International Business Machines cases the practical effect of the conditions therein involved was to preclude all use of competitors' supplies, and that in terms of practical effect those cases are to be distinguished from the case at bar which is controlled by Federal Trade Commission v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746.

In the Sinclair case, the Supreme Court was passing on the practice of leasing gasoline tanks and pumps to service station operators on the condition that they use them solely for the storage and sale of gasoline from the lessor-refiner. To the argument that this practice was in violation of the Clayton Act, the court answered (261 U.S. at page 473, 43 S.Ct. at page 453, 67 L.Ed. 746): "Respondent's written contract does not undertake to limit the lessee's right to use or deal in the goods of a competitor of the lessor, but leaves him free to follow his own judgment. It is not properly described by the complaint and is not within the letter of the Clayton Act." In dealing with the other allegation in the complaint, that the challenged practice was an unfair method of competition within the meaning of Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, the court said (261 U.S. at page 475, 43 S.Ct. at page 454, 67 L.Ed. 746): "No purpose or power to acquire unlawful monopoly has been disclosed, and the record does not show that the probable effect of the practice will be unduly to lessen competition." The controlling considerations of the Sinclair case are not present here. In that case, gasoline was sold to lessees for the purpose of resale to the consuming public; here, rivets are sold to lessees for use in the machines of the lessor. In International Business Machines Corporation v. United States, supra, 298 U.S. at page 135, 56 S.Ct. at page 703, 80 L.Ed. 1685, the

court differentiated between restrictions on the "use" of products of competitors and restrictions on the sale of their products, and distinguished the Sinclair case, saying:

"A different question is presented from that in the Sinclair case * * * as the only use made of the gasoline was to sell it, and as there was no restraint upon the purchase and sale of competing gasoline, there was no violation of the Clayton Act."

In Pick Manufacturing Co. v. General Motors Corporation, 7 Cir., 1935, 80 F.2d 641, affirmed 299 U.S. 3, 57 S.Ct. 1, 81 L. Ed. 4, the court was dealing with a provision of the contracts made with dealers by the selling organizations of General Motors Corporation, binding the dealers in Chevrolet cars not to sell or use in the repair of such cars second-hand parts or parts not manufactured by the Chevrolet Motor Company. The Supreme Court in the Pick case by a per curiam opinion affirmed the findings of the two courts below that the effect of the clause in question did not substantially lessen competition or tend to create a monopoly. There was no intimation in the court's opinion that the restrictive agreement in question would not have been within the condemnation of the Clayton Act even if the finding as to the effect on competition had been otherwise.

Under the petitioner's method of doing business it furnishes a complete riveting service—machines, rivets, and engineering to keep them in repair. It bears the cost of building the machines, the losses on depreciation and obsolescence, and the expenses of engineering services and keeping the machines in repair, which costs exceed the revenue received from rentals of leased machines. The petitioner's prices for rivets, however, run about 10-11% higher than those of competitors on the open market. There is evidence to support the petitioner's contention that selling and leasing machines may not be attractive as a separate business. All companies leasing machines follow the practice of rebating rentals and requiring the use of the lessor's rivets in leased machines. With respect to the companies which sell rivets in the industrial field but do not supply machines, the petitioner argues that they cater only to that part of the trade where the customers take the responsibility as to the selection and use of rivets and the seller assumes responsibility only for seeing that the rivets delivered are what the customers order, and not for seeing that they work in

machines. The record is clear that competition between lessors is keen and that some lessees do use the machines of more than one lessor.

The petitioner denies that its tying clause substantially lessens competition by arguing that the rivets of competitors do not in fact compete with its rivets because they will not work satisfactorily in the machines of the petitioner. While machine manufacturers naturally design them for use with their own rivets, it is clear from the testimony that the Commission has substantial grounds for its finding that machines made to operate with certain rivets are adaptable to operate with other rivets, and that any competent rivet manufacturer can make rivets to operate successfully in the machines of competitors.

■ What the petitioner is really seeking in this case is an extension of the rule of the Sinclair case, supra, in the interest of mere uniformity and efficiency of operation of rivets and machines. The evidence does indicate that the best results are obtained when the machines and rivets of one manufacturer are used together, and that if improper rivets are used repairs to the machines at the expense of the lessor and interruptions in the work at the expense of the lessee might ensue. In United Shoe Machinery Corporation v. United States, supra, 258 U.S. 451, at page 463, 42 S.Ct. at page 367, 66 L.Ed. 708, the Supreme Court commented on "the excellence of the United Company's machinery and the efficiency of its service which induced lessees to acquire its machinery," and said:

"But these considerations are apart from the pertinent issues which here confront us. No matter how good the machines of the United Company may be, or how efficient its service, it is not at liberty to lease its machines upon conditions prohibited by a valid law of the United States."

On this aspect of the case, the following excerpt from the opinion in International Business Machines Corporation v. United States, supra, 298 U.S. 131 at pages 138, 139, 56 S.Ct. at page 705, 80 L.Ed. 1085, is particularly pertinent:

"Despite the plain language of Section 3, making unlawful the tying clause when it tends to create a monopoly, appellant insists that it does not forbid tying clauses whose purpose and effect are to protect the good will of the lessor in the leased machines, even though monopoly ensues. In support of this contention appellant places

great emphasis on the admitted fact that it is essential to the successful performance of the leased machines that the cards used in them conform, with relatively minute tolerances, to specifications as to size, thickness, and freedom from defects which would affect adversely the electrical circuits indispensable to the proper operation of the machines. The point is stressed that failure, even though occasional, to conform to these requirements, causes inaccuracies in the functioning of the machine, serious in their consequences and difficult to trace to their source, with consequent injury to the reputation of the machines and the good will of the lessors. There is no contention that others than appellant cannot meet these requirements. It affirmatively appears, by stipulation, that others are capable of manufacturing cards suitable for use in appellant's machines, and that paper required for that purpose may be obtained from the manufacturers who supply appellant. * * * The suggestion that without the tying clause an adequate supply of cards would not be forthcoming from competitive sources is not supported by the evidence. 'The very existence of such restrictions suggests that in its absence a competing article of equal or better quality would be offered at the same or at a lower price.'"

The economic merit in tying rivets to machines and an economic justification for such tying will not suffice to prevent the operation of the statute. The Clayton Act is intended to preserve competitive conditions. The open market not the court should be the forum for the presentation of claims as to the merits of tied articles. The lessees are quite capable of judging for themselves in an atmosphere of competition whether or not rivets of one manufacturer will work in the machines of another. That decision involves considerations of economy and efficiency that will likely vary from lessee to lessee.

The facts of the present case do not differ materially from those before the court in Signode Steel Strapping Co. v. Federal Trade Commission, 4 Cir., 1942, 132 F.2d 48, 52. The company was leasing wire fastening tools upon the condition that the lessees would not use the leased equipment except with strapping and wire obtained from the lessor. There the contention was also made that lessees were not precluded from the use of wire and strapping of competitors in machines readily available from other dealers at little expense. The court in that case was of the opinion that lessees would not "care to equip themselves with more appliances than are necessary for their purposes" by reason of the additional expense involved in getting extra equipment to do the work of leased machines already on hand, and said, 132 F.2d at page 52:

"This means necessarily that most of those customers of the company who have leased its tools and appliances will, as a practical matter, be precluded from purchasing wire and strapping from other persons, since they cannot be used with the appliances leased from the company. * * * Such restrictive covenants as contained in the company's leases tend to hamper competition and to create monopolies; and Congress, in the exercise of its power to regulate interstate commerce, was striking at practices of this sort as unfair trade practices which should be eliminated because of their tendency."

Cf. Landis Machinery Co. v. Chaso Tool Co., 6 Cir., 1944, 141 F.2d 800, 804, cert. den. 323 U.S. 720, 65 S.Ct. 52; Oxford Varnish Corporation v. Ault & Wiborg Corporation, 6 Cir., 1936, 83 F.2d 764.

The petitioner's annual volume of sales for the years 1935 through 1939 averaged in excess of $1,000,000 per year. Its sales of approximately $1,120,000 in 1939 constituted in excess of 20% of the industry's sales in that year. As the lessor of some 8,000 machines, about 32% of the machines used in the industry, the petitioner by reason of the tying clause is in a position to compel a substantial proportion of the market to use its rivets. We are of the opinion that the Commission properly found that the effect of the restrictive condition in the petitioner's leases "has been, is, and may be to substantially lessen competition in the sale of tubular and bifurcated rivets."

A judgment will be entered dismissing the petition for review, affirming and enforcing the order of the Commission.