## UNITED STATES v. INTERNATIONAL SALT CO., Inc., et al.

District Court, S. D. New York.

Nov. 20, 1946.

304

Robert C. Barnard, Sp. Asst. to Atty. Gen., Wendell Berge, Asst. Atty Gen., and Jas. C. Wilson, Sp. Asst. to Atty. Gen., for the United States.

Putney, Twombly, Hall & Skidmore, of New York City (Lemuel Skidmore and Howard F. Ordman, both of New York City, of counsel), for defendants.

RIFKIND, District Judge.

Plaintiff has moved for summary judgment (Federal Rules Civil Procedure, Rule 56, 28 U.S.C.A. following section 723c; United States v. Associated Press, D.C.S.D. N.Y., 1943, 52 F.Supp. 362, aff'd 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013) against the corporate defendant only, on the ground that the pleadings and admissions of the defendant show absence of any genuine issue as to any material fact and that plaintiff is entitled to a judgment as a matter of law. No affidavits have been submitted by either party.

This is a civil action brought pursuant to Sec. 4 of the Sherman Act, 15 U.S.C.A. § 4, and Sec. 15 of the Clayton Act, 15 U.S.C.A. § 25, to enjoin defendant from carrying out agreements in alleged violation of Sec. 1, of the Sherman Act, 15 U.S. C.A. § 1 [1] and Sec. 3 of the Clayton Act, 15 U.S.C.A. § 14.[2]

Defendant International Salt Company, Inc. (hereinafter referred to as defendant) is the largest producer of salt for industrial uses in the United States. It is engaged in the business of manufacturing and supplying salt for industrial, agricultural and home purposes. It is also engaged in the manufacture and distribution of a machine known as the "Lixator," which is manufactured by the defendant under patents owned by it. Defendant is also engaged in the distribution of a machine known as the "Saltomat," which de-

---

[1] The relevant portion of § 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: * * *."

[2] Section 3 of the Clayton Act provides, "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monoply in any line of commerce."

fendant causes to be manufactured under a patent owned by it.

The Lixator dissolves rock salt, a raw material sold by defendant and other companies, into a salt brine solution. This brine is an essential part of the manufacturing processes of many industries, such as meat packing, refrigeration, laundering. The Saltomat is a machine used to inject a salt tablet of uniform quantity into canned products during the process of canning.

Defendant's business is interstate. In 1944, defendant sold approximately 119,000 tons of salt, having a value of approximately $500,000 for use with one or the other of the machines mentioned. Salt in many respects similar to that made and sold by the defendant is and has been sold by other companies in competition with the salt and salt tablets distributed by the defendant.

During the past three years, defendant has, and still is, engaged in entering into lease agreements with various persons for the use of the Lixator. There are in effect 840 lease agreements, each lease covering one Lixator machine. Of these 840 leases, 790 were made on the defendant's standard form of agreement. The remaining 50 vary in one or more respects.

The form contract for the Lixator contains a clause which reads as follows:

"It is further mutually agreed that the said Lixate Process Dissolver shall be installed by and at the expense of said Lessee and shall be maintained and kept in repair during the term of this lease by and at the expense of said Lessee; that the said Lixate Process Dissolver shall be used for dissolving and converting into brine only those grades of rock salt purchased by the Lessee from the Lessor at prices and upon terms and conditions hereafter agreed upon, Provided:

"If at any time during the term of this lease a general reduction in price of grade of salt suitable for use in the said Lixate.

Process Dissolver shall be made, said Lessee shall give said Lessor an opportunity to provide a competitive grade of salt at any such competitive price quoted, and in case said Lessor shall fail or be unable to do so, said Lessee, upon continued payments of the rental herein agreed upon, shall have the privilege of continued use of the said equipment with salt purchased in the open market, until such time as said Lessor shall furnish a suitable grade of salt at the said competitive price."

It further provides as follows:

"Should said Lessee fail to pay promptly the aforesaid rental, or shall at any time discontinue purchasing its requirement of salt from said Lessor, or otherwise breach any of the terms and conditions of this lease, said Lessor shall have the right, upon 30 days' written notice of intention to do so, to remove the said Lixate Process Dissolver from the possession of said Lessee."

Concerning the 50 Lixator agreements which differ from the printed form, the variations are set forth in the margin.[3]

During the past two years defendant has, and still is, engaged in entering into lease agreements with various persons for the use of the Saltomat. There are in effect 73 lease agreements covering 96 Saltomat machines. Each lease was entered into on defendant's printed form, which likewise contains a clause requiring the lessee to purchase defendant's salt tablets for use in the machine. The text of that clause is as follows:

"It is further mutually agreed that the said Salt Tablet Depositor(s) shall be installed and maintained in good condition during the term of this lease; that the said Salt Tablet Depositor(s) shall be used only in conjunction with Salt Tablets sold or manufactured by the Lessor, and that the Lessee shall purchase from the Lessor, or its agent, Salt Tablets for use in the Salt

[3] All but 4 leases contain tying clauses, requiring the purchase of some or all of the rock salt from the lessor. Three leases permit the lessee to buy 50% of its salt requirements from defendant's competitors. Five leases with Armour & Co. provide that Armour & Co. may use salt produced by itself. In most instances the modifications are of little or no importance, for example, variances relating to additional facilities furnished by the lessor, and minor variations in rental terms or cancellation terms.

Tablet Depositor(s) at prices and upon terms and conditions hereinafter agreed upon, Provided: If, at any time during the term of this lease, a general reduction in Lessor's price of Salt Tablets suitable for use in the Depositor(s) shall be made, said Lessor shall provide said Lessee with Salt Tablets at a like price."

The lease further provides:

" * * * should Lessee fail to pay promptly the aforesaid rental, or at any time discontinue purchasing its requirements of Salt Tablets for said Salt Tablet Depositor(s) from said Lessor, or its agent, or otherwise breach any of the terms and conditions of this lease, said Lessor shall have the right, upon 10 days' written notice of intention to do so, to remove the said Salt Tablet Depositor(s) from the premises and/or possession of said Lessee."

The rock salt and salt tablets sold by defendant are unpatented articles.

■ Defendant denies, and for the purposes of this motion for summary judgment I must accept its denial as fact, that it has refused to grant licenses or other rights to other persons free of the aforesaid restrictions. It admits that it has in some instances refused to sell the machine outright. Defendant, however, asserts in its affirmative defense that it has in some instances sold Lixators outright to customers who objected to leasing the machine, and that in such cases it imposed no restrictions concerning the source from which the rock salt for use in the machine was to be purchased. The answer also asserts that in no case has defendant at any time refused to install either a Lixator or a Saltomat machine on the ground that the customer objected to the defendant's restrictions concerning the purchase of salt from the defendant.

■ This case presents for decision the precise question which the Supreme Court found it unnecessary to decide in Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, rehearing denied 315 U.S. 826, 62 S.Ct. 620, 86 L. Ed. 1222. In that case the court allowed a summary judgment dismissing a suit for patent infringement where it appeared that the patent owner had annexed to the patent license an obligation on the part of the licensee to buy from the patent owner unpatented salt tablets for use with the patented dispensing machine. The court said (314 U.S. at page 494, 62 S.Ct. 406):

"It is unnecessary to decide whether respondent has violated the Clayton Act, for we conclude that in any event the maintenance of the present suit to restrain petitioner's manufacture or sale of the alleged infringing machines is contrary to public policy and that the district court rightly dismissed the complaint for want of equity".

Interstitially we find in that opinion the cells from which the decision of the instant case could grow. The court spoke of "making use of [plaintiff's] patent monopoly to restrain competition in the marketing of unpatented articles, salt tablets * * * and * * * aiding in the creation of a limited monopoly in the tablets not within that granted by the patent" (314 U.S. page 491, 62 S.Ct. 404), and also said that "courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest" (314 U.S. page 492, 62 S.Ct. 405). I am unable to bring to mind any public interest which the court could have had in contemplation other than the public interest in the maintenance of a system of free competition. The misconduct which disqualified the plaintiff in the Morton case from enforcing his patent right was interference with the system of free competition. True enough the disposition made by the court of the case rendered it unnecessary for it to consider whether the restraint upon trade was undue or unreasonable or whether the lessening of competition was substantial. But clearly a petty or merely nominal offense against the public interest would hardly justify the court in withholding its aid to the holder of the patent. This reasoning is not dispositive; it nevertheless points a direction. In that direction the court has moved. In Mercoid Corp. v. Mid-Continent Investment Co., 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, the court not only extended the doc-

trine of the Morton case to a contributory infringer, but also used language much more explicitly expressive of its intention to go forward in the direction but faintly suggested by the Morton case. It said:

"It is the public interest which is dominant in the patent system. * * *. The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use. * * *. The patent is employed to protect the market for a device on which no patent has been granted. But for the patent such restraint on trade would *plainly run afoul of the anti-trust laws*. If the restraint is lawful because of the patent, the patent will have been expanded by contract. * * *. Such a vast power 'to multiply monopolies' at the will of the patentee * * * would carve out exceptions to the anti-trust laws which Congress has not sanctioned. * * *. Should such a decree [an injunction against infringement] be entered, the Court would be placing its imprimatur on a scheme which involves a misuse of the patent privilege and *a violation of the anti-trust laws*." 320 U.S. 665, 666, 667, 670, 64 S.Ct. 271, 272, 273. (Italics supplied.)

True, the Mercoid decision was not reached upon a motion for summary judgment, but the facts of record in that case show nothing more than is here admitted on motion.

In the light of these general principles the problem presented by the instant case must be decided. The defendant here urges the impropriety of summary judgment because of the presence of two triable issues, namely, (1) whether the Lixator and Saltomat leases do in fact substantially lessen competition or tend to create a monopoly in salt, and (2) whether the restraint of trade affected by these leases, if any, is an unreasonable restraint.

This contention is confronted by two possible answers. The first is that the conduct complained of is unlawful per se. Fashion Originators Guild of America v. Federal Trade Commission, 2 Cir., 1940, 114 F.2d 80, 85 (footnote [4]), affirmed, 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949.

The other is that a restraint which affects 900 business units in a business aggregating $500,000 per annum is, without more, undue and unreasonable, and the lessening of competition, on its face, substantial.

Were it not for Federal Trade Commission v. Sinclair Refining Co., 1923, 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 and Pick Mfg. Co. v. General Motors Corp., 1936, 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4, affirming 7 Cir., 80 F.2d 641, I should rest this case on the first answer. In this case, like in the cited cases, the lessees were apparently free to obtain competitive machines and equipment to handle the salt and salt tablets, and thereby be in a position to purchase salt from the defendant's competitors. At least I must assume that such is the fact in the absence of anything in the pleadings to contradict it. And while it is true that the holding of the Sinclair case and the Pick case has been severely restricted (International Business Mach. Corp., v. United States, 1936, 298 U.S. 131, 135, 56 S.Ct. 701, 80 L.Ed. 1085; Judson L. Thomson Mfg. Co. v. Federal Trade Comm., 1 Cir., 1945, 150 F.2d 952, 956, 957, certiorari denied 326 U.S. 776, 66 S.Ct. 267; Oxford Varnish Corp. v. Ault & Wiborg Corp., 6 Cir., 1936, 83 F.2d 764, 767, rehearing denied 6 Cir., 85 F.2d 390), nevertheless I prefer to rest the decision in this case upon the second answer. The intent and object of the Lixator and Saltomat leases were manifestly to exclude defendant's competitors from at least one portion of the business of the 900 lessees. Nor do I think such a decision foreclosed by the Sinclair or the Pick case.

---

4 "Price fixing is not, however, the only means unlawful per se; the interest of the consumer is not all that determines the 'reasonableness' of a contract 'in restraint of trade.' It is also unlawful to exclude from the market any of those who supply it—assuming that there is no independent reason by virtue of their conduct to justify their exclusion—and it is no excuse for doing so that their exclusion will result in benefits to consumers, or to the producers who remain." [114 F.2d 85].

In the Sinclair case the pumps did not appear to be patented. Here the machines are patented. Presumably, therefore, the identical machines cannot be procured elsewhere. Secondly, in the Sinclair case, the pumps were the vendee's means of resale. There was, therefore, an inducement to obtain additional equipment to satisfy customers' demand for other gasoline. Here the product is unknown to the consumer and the inducement is, therefore, lacking. Third, although unstated in the Sinclair case, it is nevertheless obvious that to allow a gasoline dealer to serve the public, through a Sinclair pump, gasoline other than Sinclair's would amount to cooperation in a fraud. No such ingredient is present in the instant case. Signode Steel Strapping Co. v. Federal Trade Comm., 4 Cir., 1942, 132 F.2d 48, 53.

In the Pick case an automobile manufacturer required a dealer by contract to agree not to sell or use in repair of automobiles made by that manufacturer, used parts or parts not manufactured or authorized by the manufacturer. The manufacturer gave to the purchasers of these cars, that is, to the ultimate consumers, a warranty against defect in material and workmanship for a specified period. The replacements were operating parts of a complex mechanism, the origin of which is inevitably attributed to the manufacturer and the failure of which is inevitably placed at his door, with resulting impairment of good will and damage to the reputation of his product. Oxford Varnish Corp. v. Ault & Wiborg Corp., supra, at page 767 of 83 F.2d.

In the instant case the public is totally unaware of either the use of salt in the product or of the source of any salt and the means by which it was acquired. The preservation of the good will of the purchasing public is not at all involved.

Moreover, an analysis of the prices reflected in the 50 Lixator agreements which have been submitted, shows a nominal annual rental of $1 in 13 instances, and no rental other than "good and valuable consideration" in 3 instances. In all Saltomat leases there is provision that, after the lapse of five years, rental shall be at the nominal amount of $1. The same is true in all Lixator leases, with the exception of six instances. In these cases, therefore, the only valuable consideration which the lessor obtained is the lessee's promise to buy unpatented salt from the lessor. In other words, the patent is being used solely to restrain competition.

It appears, therefore, that a violation of Sec. 1 of the Sherman Act and of Sec. 3 of the Clayton Act has been made out. International Business Machines Corp. v. United States, supra, 298 U.S. at page 140, 56 S.Ct. at page 705; Radio Corporation of America v. Lord, 3 Cir., 1928, 28 F.2d 257, 260, certiorari denied 278 U.S. 648, 49 S. Ct. 83, 73 L.Ed. 560; Oxford Varnish Corp. v. Ault & Wiborg Corp., supra; Signode Steel Strapping Co. v. Federal Trade Comm., supra.

There remains for consideration only the affirmative defense, unsupported by affidavit submitted in opposition to the motion. Therein the defendant alleges that by leasing the machines, instead of selling them, defendant was able to require the machines to be kept in good repair, thereby insuring to the lessee a satisfactory operation of the machine and protecting the good will of the defendant with its customers and the trade. The protection of good will of the lessor is insufficient as a defense where the substantial benefit of the tying clause to the lessor is in the elimination of competition and where it does not appear that the protection of good will cannot be achieved by methods that do not tend to monopoly and are not otherwise unlawful. International Business Machines Corp. v. United States, supra, 298 U.S. at page 138, 56 S.Ct. at page 704.

Defendant further alleges in its affirmative defense that in entering into the lease it had no intention to create a monopoly or to restrain trade, but only to secure for itself the opportunity to meet competitive prices. Manifestly, defendant's subjective state of mind cannot affect the determination of the present motion.

The answer further alleges that defendant has in many instances sold the Lix-

ators outright where a customer has objected to leasing the machine, and that defendant has never refused to install a machine because the customer objected to sign one of the standard forms. In a suit to enjoin the use of a lease which is violative of the Clayton Act, it is no defense that an alternative form of lease claimed to be unobjectionable was offered to the lessee. United Shoe Machinery Corp. v. United States, 1922, 258 U.S. 451, 464, 42 S.Ct. 363, 367, 66 L.Ed. 708, rehearing denied 259 U.S. 575, 42 S.Ct. 585, 66 L.Ed. 1071.

Defendant's allegation, unsupported by affidavit, that in many instances lessees purchased salt and salt tablets from sources other than defendant, and that in such instances the defendant has made no effort to enforce the covenants of the lease, is no defense in an action of this character. The power to do so is ever present. United Shoe Machinery Corp. v. United States, supra, 258 U.S. at page 458, 42 S. Ct. at page 365.

Finally, it is alleged by defendant that to insure the satisfactory operation of the machine, and for the protection of its good will, it is necessary to use salt and salt tablets of a specified grade and content which defendant's product alone is sure to offer. This defense is likewise insufficient even if the allegation were true, which is doubtful.[5] International Business Machines Corp. v. United States, supra, 298 U.S. at page 138, 56 S.Ct. at page 704; Judson L. Thomson Mfg. Co. v. Federal Trade Commission, supra, 150 F.2d at page 957.

The motion for summary judgment is granted.

Defendant calls attention to the nature of the relief demanded by plaintiff in its prayer for judgment and argues that in any event plaintiff is not entitled to all of the relief it seeks. No decision is now made with respect to it. Further hearing will be had concerning the terms of the decree to be entered herein.

---

[5] Out of the 50 submitted Lixator agreements, in five instances the lessee was permitted to use its own salt. In two instances the lessee was required to buy from the lessor only 50% of the salt used. In four instances there was no tying clause.